[No. E037066. Fourth Dist., Div. Two. Mar. 23, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTONIO PEREZ LOPEZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.A.1. and II.B.

## Counsel

Dacia A. Burz, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Peter Quon, Jr., and Pat Zaharopoulos, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**RICHLI, J.**—Antonio Lopez appeals a judgment committing him to the California Department of Mental Health after a jury determined him to be a mentally disordered offender (MDO) within the meaning of Penal Code section 2970.[1] We affirm.

I

### FACTUAL AND PROCEDURAL BACKGROUND

A. *Previous Commitments*

The MDO law (§§ 2960–2981) provides for the civil commitment of a person previously convicted and punished for a violent crime who, because of a severe mental disorder, represents a substantial danger of physical harm to others if released. The commitment is for one year and can be renewed annually as long as the disorder and the danger of harm exist. The committee is entitled to a jury trial, a unanimous verdict, proof beyond a reasonable doubt, and appointed counsel if he or she is indigent. (§§ 2962, 2970, 2972; see generally *In re Qawi* (2004) 32 Cal.4th 1, 9 [7 Cal.Rptr.3d 780, 81 P.3d 224].)

Prior to the present proceeding, Lopez was committed under the MDO law six successive times. All of these commitments, as well as the present one, were based on Lopez's conviction in May 1995 for making a terrorist threat against his father's girlfriend, Betty Shepherd. (See *People v. Lopez* (1999) 74 Cal.App.4th 675, 677 [88 Cal.Rptr.2d 252].) Lopez served prison time for that offense and was returned to prison when his parole was revoked in July 1997.

---

[1] Undesignated statutory references are to the Penal Code.

### 1. *Initial commitment*

In August 1998, the Board of Prison Terms determined Lopez was an MDO. Lopez requested a trial, and a jury confirmed the MDO finding. The court committed Lopez to the Department of Mental Health for treatment, and he was placed in Atascadero State Hospital (ASH). (*People v. Lopez, supra,* 74 Cal.App.4th 675, 678.)

### 2. *First petition*

During his time at ASH, Lopez threatened the staff more than 10 times and tried to strike staff members who broke up an altercation between him and another patient. His diagnoses at that time included schizoaffective disorder, substance abuse, and antisocial personality disorder.

In October 1999, the People filed a petition for recommitment of Lopez pursuant to section 2970. The matter proceeded to a jury trial in July 2000, at which the People called Lopez to testify in their case-in-chief. The jury found Lopez was an MDO, and in August 2000, he was transferred to Patton State Hospital (PSH).

### 3. *Second petition*

Lopez continued to show aggressive behavior, paranoia, noncompliance with staff, and rapid mood changes. In February 2001, the People filed a second recommitment petition. Lopez waived trial and stipulated that his commitment would be extended to March 2002.

### 4. *Third petition*

In November 2001, the People filed a third recommitment petition. Since the last petition, a large spring and a sharp piece of metal had been found in Lopez's locker, which he stated he was going to use on the staff. When asked for a urine sample, he became physically assaultive and had to be placed in five-point restraints for four days.

Lopez waived a jury trial on the petition, and in December 2001 the parties submitted the matter to the court without argument. The court extended Lopez's commitment to March 2003.

### 5. *Fourth petition*

Prior to the expiration of the March 2003 commitment, the People filed a fourth petition for recommitment. Lopez agreed to a one-year extension of his commitment, and the court in February 2003 extended the commitment to March 2004.

### 6. Fifth petition

In November 2003, the People filed a fifth petition for recommitment. In December 2003, the parties stipulated, and the court ordered, that the commitment be extended to September 2004.

### 7. Sixth petition

In May 2004, the People filed a sixth petition for recommitment, the one at issue in the present case. The matter proceeded to a jury trial in November 2004.

## B. Trial Evidence

The People presented testimony of two health care professionals from PSH who had treated Lopez. The People also presented Lopez's testimony from the 2000 recommitment proceeding. Lopez presented no evidence in his defense.

### 1. Dr. Bustrum

Dr. Joy Bustrum was a PSH staff psychologist who treated Lopez beginning in August 2003. She testified based on her personal experience with Lopez and on her review of his medical file.

Dr. Bustrum diagnosed Lopez with schizoaffective disorder of the depressed type, a severe mental illness that was not in remission. She found in Lopez a pattern of being suspicious or paranoid, followed by threats and then physical violence against another person. She noted that in 1978 he was charged with battery, and in 1988 and 1989 he was charged with physical assault against a correctional officer and a police officer. He also received numerous citations in prison during the 1990's for physically fighting with peers. At PSH, Lopez had threatened people 19 times from the beginning of 2003 through September 2004.

Dr. Bustrum also concluded Lopez had a polysubstance abuse problem. His abuse of alcohol and drugs had led to two arrests in 1977 for driving under the influence, an arrest for possession of a controlled substance in 1977 or 1978, citations during the 1980's or 1990's for having drugs in prison, and a parole revocation in 1997.

Dr. Bustrum concluded Lopez still needed to be in a hospital environment with sustained further intensive treatment before he could go out into the community. However, he did not willingly follow his treatment plan, which included individual and group psychotherapy and an intensive substance abuse program. Though he had not acted out physically since the July 2003 incident, he did not have insight into how he was functioning as a person and therefore was at risk of either physically assaulting someone or relapsing in his mental illness. In Dr. Bustrum's opinion, Lopez still posed a substantial risk of physical danger to others because of his mental illness.

### 2. *Dr. Anosa*

Dr. Nellie Anosa was Lopez's treating psychiatrist at PSH. She testified Lopez suffered from schizoaffective disorder of the depressive type, a severe mental disorder. He also suffered from polysubstance dependence.

Lopez's disorder caused him to become angry and hostile over little things. Every two or three months he would have an episode of angry or assaultive behavior. He was constantly thinking that the staff had singled him out.

Dr. Anosa believed Lopez posed a danger to others because of his mental illness. She explained: "Mr. Lopez has not really worked on his problem. He continues to be very angry, very paranoid. . . . He has not followed all the treatment modalities that we asked him to do."

### 3. *Lopez's testimony from the 2000 recommitment trial*

The People called Lopez as a witness, but he refused to testify, invoking the Fifth Amendment. Over Lopez's objection, the court permitted the People to read Lopez's testimony from the July 2000 jury trial and admitted the testimony into evidence.

In the prior testimony, Lopez stated that in about 1983, he was sent to the California Institute for Men for possession of a deadly or dangerous weapon. In about 1986, he was sent to the state prison at Susanville; he claimed not to know the reason. While there, he threw hot chocolate during a food riot, unintentionally hitting a guard, and was placed in a higher-security unit.

Lopez was transferred to Folsom State Prison and eventually released in 1991. About a year later, he was sent back to Folsom for assault with a deadly weapon and kidnapping. He was released in 1994 but was sent back to

Folsom for the terrorist threat against Ms. Shepherd in 1995. When he was arrested for that crime, Lopez told one of the officers, an African-American, that he had an "Aryan brother" who would "get after" the officer.

At Folsom, Lopez stabbed his cellmate in the heart in an attempt to kill him. He explained he did this because the cellmate had "snitched off some people at Soledad" whom Lopez knew.

Shortly before he was sent to ASH, Lopez threatened an officer at the California Men's Colony. According to Lopez, the officer threatened to kill him, and Lopez responded, "[A]ll right. Well two can play at that too."

About the time Lopez arrived at ASH, in August 1998, he told a doctor he was probably going to kill someone. In January 1999, he said he felt like going off and hurting someone. In February 1999, he got into a fight with another patient and had to be restrained by staff members.

Lopez also testified about his history of drug and alcohol offenses. He was arrested in 1977, 1978, and 1979 for driving under the influence. In 1978 or 1979, he was convicted of possessing PCP (phencyclidine). In 1979, he was arrested for possession of a needle. In 1982, he was convicted of possessing a drug pipe that he used to smoke marijuana. In 1986, his parole was violated for using, or being under the influence of, a controlled substance and for possessing a syringe and a knife. While in prison, he was "busted" for using marijuana.

### C. *Judgment*

As stated, the jury found Lopez was an MDO within the meaning of section 2970. The court ordered that Lopez continue involuntary treatment at PSH until September 2005.

## II

## DISCUSSION

### A. *Equal Protection*

Lopez argues that by admitting his testimony from the 2000 recommitment proceeding, the court violated his right of equal protection under the federal

and state Constitutions. He bases this claim on two decisions of the Fifth District Court of Appeal holding that potential civil committees could not be compelled to testify at proceedings seeking their commitment. (*People v. Haynie* (2004) 116 Cal.App.4th 1224, 1230 [11 Cal.Rptr.3d 163] (*Haynie*) [proceeding to extend commitment of insanity acquittee pursuant to § 1026.5]; *In re Luis C.* (2004) 116 Cal.App.4th 1397, 1403 [11 Cal.Rptr.3d 429] (*Luis C.*) [proceeding to extend Youth Authority commitment pursuant to Welf. & Inst. Code, §§ 1800–1803].)

Lopez acknowledges that *Haynie* and *Luis C.* involved civil commitment laws other than the MDO law, but he argues MDO's are similarly situated to committees under those other laws. Therefore, he contends, the state may not constitutionally extend the right not to testify to committees under those laws but not to MDO's. We first consider whether Lopez preserved this claim for appeal.

### 1. *Waiver/forfeiture**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### 2. *Denial of equal protection*

Had Lopez properly preserved his claim for appeal, it would fail on the merits. *Haynie* and *Luis C.* do not provide a persuasive basis for extending the right not to testify to MDO's based on the constitutional guarantee of equal protection.

#### a. *Privilege not to testify*

The Fifth Amendment to the United States Constitution and article I, section 15 of the California Constitution guarantee the privilege against self-incrimination. The privilege encompasses "two separate and distinct testimonial privileges . . . . In a *criminal* matter a defendant has an absolute right not to be called as a witness and not to testify. [Citation.] Further, in any proceeding, *civil or criminal*, a witness has the right to decline to answer questions which may tend to incriminate him in criminal activity [citation]." (*Cramer v. Tyars* (1979) 23 Cal.3d 131, 137 [151 Cal.Rptr. 653, 588 P.2d 793].)

The privilege of a criminal defendant not to testify has *not* been extended to civil committees. In *Allen v. Illinois* (1986) 478 U.S. 364, 374–375 [92 L.Ed.2d 296, 106 S.Ct. 2988] the United States Supreme Court held that

---

*See footnote, *ante*, page 1099.

the privilege did not apply to proceedings under the Illinois Sexually Dangerous Persons Act, because the proceedings "were not 'criminal' within the meaning of the Fifth Amendment to the United States Constitution . . . ." (*Id.* at p. 375.) In *Cramer,* the California Supreme Court held the privilege did not apply in commitment hearings of mentally retarded persons (Welf. & Inst. Code, §§ 6500–6512), because "commitment of mentally retarded persons must be deemed essentially civil in nature." (*Cramer v. Tyars, supra,* 23 Cal.3d at p. 137.)

Courts of Appeal have held the privilege not to testify does not apply in proceedings under a variety of civil commitment laws, including the MDO law. In *People v. Merfeld* (1997) 57 Cal.App.4th 1440 [67 Cal.Rptr. 2d 759], an MDO claimed he had an absolute right not to testify at his trial under section 2972, because it was "essentially a criminal prosecution." (*Merfeld,* at p. 1443.) Quoting from *Cramer v. Tyars, supra,* 23 Cal.3d 131, 139, the court concluded that " 'while appellant could not be questioned about matters that would tend to incriminate him, he was subject to call as a witness and could be required to respond to nonincriminatory questioning which may have revealed his mental condition to the jury . . . .' [Citation.]" (*Merfeld,* at p. 1446; see also *People v. Clark* (2000) 82 Cal.App.4th 1072, 1079 [98 Cal.Rptr.2d 767] [requiring MDO to testify about her actions and mental condition during underlying offense did not violate her privilege against self-incrimination]; *People v. Leonard* (2000) 78 Cal.App.4th 776, 792–793 [93 Cal.Rptr.2d 180] [defendant in proceeding under Sexually Violent Predator (SVP) Act (Welf. & Inst. Code, § 6600 et seq.) had no right not to be called as a prosecution witness].)

Against this backdrop, the Fifth District Court of Appeal decided *Haynie* and *Luis C. Haynie* involved a proceeding under section 1026.5 to extend the commitment of a defendant found not guilty by reason of insanity (NGI). Over objection, the trial court permitted the prosecution to call the defendant as a witness. Holding that this was reversible error, the Court of Appeal noted that section 1026.5, subdivision (b)(7) (section 1026.5(b)(7)) provides that an NGI committee " 'shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings,' " and that " '[a]ll proceedings shall be in accordance with applicable constitutional guarantees.' " (*Haynie, supra,* 116 Cal.App.4th at p. 1228.) The court stated: "A defendant in a criminal matter has an absolute right not to be called as a witness and not to testify. [Citations.] Under the plain language of the statute, because Haynie is entitled to the same rights guaranteed to a criminal defendant, he should not have been compelled to testify in the prosecution's case at his commitment extension trial." (*Ibid.*)

The *Haynie* court acknowledged that previous decisions had held the same language "did not make all rights guaranteed for criminal proceedings applicable in section 1026.5 proceedings." (*Haynie, supra,* 116 Cal.App.4th at p. 1228.) In *People v. Superior Court (Williams)* (1991) 233 Cal.App.3d 477, 488 [284 Cal.Rptr. 601] (*Williams*), for example, the court held: "The statutory language merely codifies the application of constitutional protections to extension hearings mandated by judicial decision. It does not extend the protection of constitutional provisions which bear no relevant relationship to the proceedings. [Citation.]" The court concluded the prohibition on double jeopardy did not bear a relevant relationship to NGI recommitment proceedings, "which are civil in nature, are for the purpose of treatment, not punishment, and are not an adjudication of a criminal act or offense . . . ." (*Ibid.*)

Similarly, in *People v. Powell* (2004) 114 Cal.App.4th 1153, 1157–1158 [8 Cal.Rptr.3d 441] (*Powell*) the court held section 1026.5 did not require personal waiver of a jury trial in an NGI recommitment proceeding. Citing *Williams,* the court stated that section 1026.5 " 'merely codifies the application of constitutional protections to extension hearings mandated by judicial decision.' [Citation.]" (*Powell,* at p. 1158.) Judicial decisions had not extended to civil committees the right of a criminal defendant to decide personally whether to waive a jury, because in civil commitment cases "the jury does not impose criminal punishment and has no power to determine the extent to which the person will be deprived of his or her liberty . . . ." (*Id.* at p. 1159.)

The *Haynie* court disagreed with the *Williams* court's view that section 1026.5(b)(7) merely guarantees the constitutional protections that are mandated by judicial decision. It reasoned that if the Legislature only intended to grant the protections that already had been granted by the courts, section 1026.5(b)(7) would be surplusage. Further, if in fact the Legislature did not mean in section 1026.5(b)(7) to grant all protections guaranteed to a criminal defendant, the Legislature and not the courts should specify which protections did not apply. The fact that the courts had granted certain rights to civil committees did not prevent the Legislature from providing additional rights. (*Haynie, supra,* 116 Cal.App.4th at p. 1230.)

The *Haynie* court did, however, agree with *Williams* that despite its literal language, section 1026.5(b)(7) did not guarantee constitutional protections that did not have a relevant relationship to commitment proceedings. It held, though, that "[t]he right to not be compelled to testify against oneself is clearly and relevantly implicated when a person is called by the state to testify in a proceeding to recommit him or her even if what is said on the witness stand is not per se incriminating." (*Haynie, supra,* 116 Cal.App.4th at p. 1230.)

Six days after deciding *Haynie*, the same panel decided *Luis C.* That case involved a proceeding to extend the commitment of a person subject to the control of the California Youth Authority (CYA). (See Welf. & Inst. Code, §§ 1800–1803.) A CYA commitment may be extended if the discharge of the person "would be physically dangerous to the public because of the person's mental or physical deficiency, disorder, or abnormality . . . ." (Welf. & Inst. Code, § 1800.) Like Penal Code section 1026.5(b)(7), the law authorizing extended CYA commitments provides that a person subject to the law "shall be entitled to all rights guaranteed under the federal and state constitutions in criminal proceedings." (Welf. & Inst. Code, § 1801.5.)

Citing its discussion in *Haynie*, the *Luis C.* court held that this language afforded a person subject to extended CYA commitment the privilege not to testify. Accordingly, the court held, the trial court in a commitment proceeding was required to instruct the jury that the committee had a right not to testify and that no adverse inference could be drawn from his decision not to testify. (*Luis C., supra,* 116 Cal.App.4th at p. 1403.)

> b. *Application of Haynie and Luis C. to Lopez's equal protection claim*

Based on *Haynie* and *Luis C.,* Lopez argues that the criminal privilege against self-incrimination must be extended to MDO committees. He acknowledges that the MDO law does not contain a provision equivalent to those in the NGI law and the extended CYA commitment law, expressly extending all constitutional rights of a criminal defendant to MDO committees. However, he contends that equal protection compels the state to extend to MDO committees the same rights enjoyed by committees under the NGI and extended CYA commitment laws.

The California Supreme Court has established that although the procedures leading to the civil commitment of various classes of persons "need not be identical in all respects," it is a denial of equal protection to "deny to one such class fundamental rights or privileges accorded to another . . . ." (*In re Gary W.* (1971) 5 Cal.3d 296, 304 [96 Cal.Rptr. 1, 486 P.2d 1201]; accord, *Baxstrom v. Herold* (1966) 383 U.S. 107, 111–112 [15 L.Ed.2d 620, 86 S.Ct. 760] [state could not arbitrarily deny right to jury determination of sanity to one class of civil committees while making it available to all others].) Lopez argues that it violates equal protection to deny MDO's the right not to testify when that right has been afforded to the two classes of committees involved in *Haynie* and *Luis C.*

Whether Lopez's equal protection claim is valid therefore depends upon whether *Haynie* and *Luis C.* correctly concluded that Penal Code section 1026.5(b)(7) and Welfare and Institutions Code section 1801.5 extend the privilege not to testify to NGI and CYA committees. If that conclusion is not correct—if the Legislature has not, in fact, extended the privilege to those classes of committees—then there can be no equal protection violation in not extending it to others, including MDO's.

For the reasons that follow, we conclude the interpretations of Penal Code section 1026.5(b)(7) and Welfare and Institutions Code section 1801.5 adopted in *Haynie* and *Luis C.* are unsupported. We will limit our discussion to *Haynie*, because *Luis C.* merely follows *Haynie* without any additional analysis of the issue under discussion.

Central to *Haynie*'s interpretation of section 1026.5(b)(7) was the language of the statute. As stated, section 1026.5(b)(7) provides that an NGI committee "shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings." Since the defendant in a criminal proceeding has an absolute right not to testify, it necessarily followed, in the view of the *Haynie* court, that an NGI committee had that right too. Based on what it determined was the plain meaning of section 1026.5(b)(7), the court disagreed with *Williams*'s view that section 1026.5(b)(7) merely guarantees the constitutional protections that are mandated by judicial decision. (*Haynie*, *supra*, 116 Cal.App.4th at pp. 1228–1230.)

In addition, the *Haynie* court noted that *Williams* and *Powell* did not involve the privilege against self-incrimination. It concluded that even if *Williams* and *Powell* were correct in holding that section 1026.5(b)(7) did not guarantee the protection against double jeopardy and the requirement of a personal jury trial waiver, the statute did guarantee the privilege against self-incrimination, because that privilege is clearly and relevantly implicated in an NGI commitment proceeding. (*Haynie*, *supra*, 116 Cal.App.4th at pp. 1228–1230.)

*Haynie* did not, however, discuss the fact that another previous decision that *did* involve the privilege against self-incrimination had held that *identical language* to that set forth in Penal Code section 1026.5(b)(7) *did not* extend the privilege to a civil committee. *People v. Henderson* (1981) 117 Cal.App.3d 740 [172 Cal.Rptr. 858] (*Henderson*) was a proceeding to extend the defendant's commitment to the Department of Mental Health under the former law governing civil commitment of mentally disordered sex offenders (MDSO law; Welf. & Inst. Code, former § 6300 et seq.). The defendant argued, in part,

that he was entitled to the privilege against self-incrimination under Welfare and Institutions Code former section 6316.2, subdivision (e), which provided: "The patient shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings. All proceedings shall be in accordance with applicable constitutional guarantees." As can be seen, except for the use of "patient" instead of "person," that language is identical to that of Penal Code section 1026.5(b)(7). (*Henderson*, at pp. 746–747.)

Notwithstanding the statutory language, *Henderson* concluded: "Subdivision (e) of [Welfare and Institutions Code former] section 6316.2 codifies the application of constitutional protections to MDSO proceedings mandated by judicial decision [citations]. It does not extend the protection of the constitutional privileges against self-incrimination to testimonial communications which are not incriminatory." (*Henderson*, *supra*, 117 Cal.App.3d at p. 748.) In other words, an MDSO committee was entitled to the ordinary privilege applicable to civil proceedings, which protects only incriminating communications, but not to the broader privilege afforded a criminal defendant.

The *Haynie* court's only mention of *Henderson* was to note that the court in that case "held that the admission at trial of Henderson's statements to hospital staff made in the course of routine therapy sessions that he was sexually stimulated by violence did not violate his privilege against self-incrimination." (*Haynie*, *supra*, 116 Cal.App.4th at p. 1229.) The court did not discuss the fact that *Henderson* had concluded identical language to that found in section 1026.5(b)(7) did not grant a committee the self-incrimination privilege enjoyed by a criminal defendant.

At the least, the conclusion of the court in *Henderson* creates a direct conflict between that case and *Haynie*. The same language cannot mean something different in the NGI statute than it meant in the former MDSO statute. That conflict must be resolved, and the correct interpretation of section 1026.5(b)(7) must be determined, before Lopez's equal protection claim in this case can be resolved.

In support of its conclusion that the former MDSO statute did not grant a committee the privilege against self-incrimination afforded to a criminal defendant, but only the "constitutional protections . . . mandated by judicial decision," the *Henderson* court cited *People v. Burnick* (1975) 14 Cal.3d 306 [121 Cal.Rptr. 488, 535 P.2d 352] (*Burnick*) and *People v. Feagley* (1975) 14 Cal.3d 338 [121 Cal.Rptr. 509, 535 P.2d 373]. (*Henderson*, *supra*, 117 Cal.App.3d at p. 748.) In those decisions, the California Supreme Court held that an MDSO

committee is entitled to require the state to prove his dangerousness beyond a reasonable doubt by a unanimous jury. (*Burnick*, at p. 332; *Feagley*, at p. 342.) Thus, we infer that in referring to the protections "mandated by judicial decision," the *Henderson* court meant to refer to the rights to proof beyond a reasonable doubt and to a unanimous verdict that the Supreme Court found applicable in *Burnick* and *Feagley*.

Although the rights to proof beyond a reasonable doubt and a unanimous verdict are not at issue here, *Burnick* is nonetheless significant for our purposes, for the reason discussed in *Conservatorship of Bones* (1987) 189 Cal.App.3d 1010 [234 Cal.Rptr. 724] (*Bones*). In *Bones*, the court considered the proper interpretation of Welfare and Institutions Code section 5303, a provision of California's general civil commitment statute, the Lanterman-Petris-Short (LPS) Act. The LPS Act provides for the temporary commitment of a person who presents "a demonstrated danger of inflicting substantial physical harm upon others." (Welf. & Inst. Code, § 5300, subd. (a).) Welfare and Institutions Code section 5303 provides that a commitment hearing shall be conducted "in accordance with constitutional guarantees of due process of law and the procedures required under Section 13 of Article 1 of the Constitution of the State of California."

The court in *Bones* concluded that Welfare and Institutions Code section 5303 did *not* give a potential committee a privilege not to testify. At first blush, that conclusion would seem inconsistent with the statute. The statute specifically states that a commitment hearing must conform to the procedures required under California Constitution, article I, section 13. Though that constitutional provision has since been amended, the court in *Bones* noted that at the time Welfare and Institutions Code section 5303 was enacted, article I, section 13 provided in part: " 'No person shall be . . . compelled, in any criminal case, to be a witness against himself . . . .' " (*Bones, supra,* 189 Cal.App.3d at p. 1016.) Seemingly, the reference in Welfare and Institutions Code section 5303 to the "procedures required" under article I, section 13 would necessarily include the right not to testify.

However, the *Bones* court concluded otherwise: "In our view the reference to this provision in [Welfare and Institutions Code] section 5303 was not intended to import the whole of constitutional criminal procedure into postcertification proceedings." (*Bones, supra,* 189 Cal.App.3d at p. 1016.) The court explained that in 1974, California Constitution, article I, section 13 "was repealed and its provisions were distributed among other sections of the Constitution. The guarantees against double jeopardy and self-incrimination migrated to article I, section 15, while the due process clause is now found at article I, section 7, subdivision (a)." (*Bones,* at p. 1016.)

The *Bones* court then noted that in *Burnick*, "the Supreme Court treated [Welfare and Institutions Code] section 5303 as referring to section 7 of the current Declaration of Rights, and *not to section 15.*" (*Bones, supra,* 189 Cal.App.3d at p. 1016, italics added, fn. omitted.) The court referred to footnote 5 of *Burnick,* in which the Supreme Court stated that Welfare and Institutions Code section 5303 requires that a commitment hearing be conducted " 'in accordance with constitutional guarantees of due process of law and the procedures required under Section 13 [*now § 7, subd. (a)*] of Article I of the Constitution of the State of California.' " (*Burnick, supra,* 14 Cal.3d at p. 314, fn. 5, bracketed material in original, italics added; quoted in *Bones,* at p. 1016, fn. 4.) The *Bones* court concluded the Supreme Court's reference to California Constitution article I, section 7, but not article I, section 15, "indicated that the effect of section 5303 is merely to emphasize the applicability of due process principles [§ 7] and not to incorporate the whole panoply of criminal defense rights. [§ 15]." (*Bones,* at p. 1016.)[4]

*Burnick,* as interpreted in *Bones,* therefore affects our analysis in the following way: The Supreme Court in *Burnick* apparently concluded that, despite the Legislature's reference in Welfare and Institutions Code section 5303 to "the procedures required under" the part of the constitution containing the right not to testify, the Legislature did not intend that a potential LPS committee have the right not to testify. Rather, the Legislature meant only to afford the committee the rights guaranteed by due process, i.e., the rights to proof beyond a reasonable doubt and a unanimous jury.

If that conclusion is correct, then it is reasonable also to conclude the Legislature acted with the same intent in enacting section 1026.5(b)(7). That is, in granting a potential NGI committee "the rights guaranteed under the federal and state Constitutions for criminal proceedings," the Legislature

---

[4] In a petition for rehearing, defendant asserts that "*Bones* [*sic*] and *Burnick*'s apparent construction of Welfare and Institutions Code, section 5303 is not controlling here because the pertinent language in Welfare and Institution [*sic*] Code, section 5303 is *substantially different* from the constitutional provision in section 1026.5, subdivision (b)(7) and former Welfare and Institutions Code section 6316.2, subdivision (e)." (Original italics.) Defendant then asserts: "Although Welfare and Institutions Code section 5305 provides that the LPS proceeding shall be conducted in accordance with 'the constitutional guarantees of due process of law. . . .', it is significantly different from section 1026.5 and former Welfare and Institutions Code section 6316.2, subdivision (e) because it does not provide that such 'person[s] shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings.' " (Ellipsis and bracketed material in original.)

As is apparent, defendant in quoting Welfare and Institutions Code section 5303 has omitted the portion of the statute that provides that hearings shall be conducted in accordance with "the procedures required under Section 13 of Article 1 of the Constitution of the State of California." To claim that Welfare and Institutions Code section 5303 is substantially different from Penal Code section 1026.5(b)(7) and Welfare and Institutions Code former section 6316.2, subdivision (e) by disregarding the very language that makes them functionally equivalent is not a persuasive basis on which to attempt to distinguish *Bones* and *Burnick.*

intended to grant the rights guaranteed by due process, such as proof beyond a reasonable doubt and a unanimous verdict, but not other rights that are granted criminal defendants alone, such as the privilege not to testify.

That conclusion becomes even more reasonable when one considers the circumstances under which section 1026.5(b)(7) was enacted. As explained in *Williams*, "Penal Code section 1026.5 was enacted in 1979, as emergency legislation in response to the California Supreme Court's decision of *In re Moye* [(1978) 22 Cal.3d 457 [149 Cal.Rptr. 491, 584 P.2d 1097] (*Moye*)]." (*Williams, supra,* 233 Cal.App.3d at p. 487, fn. omitted.) At the time *Moye* was decided, the Legislature had not enacted a procedure for the civil commitment and recommitment of individuals acquitted by reason of insanity. Those individuals were simply committed for an indefinite period of time, which could exceed the length of time they could have been incarcerated if they simply had been found guilty.

*Moye* concluded this situation violated equal protection principles. It noted that the Legislature previously had enacted civil commitment procedures for other individuals who were similarly situated to NGI committees. The court stated: "Perhaps the most glaring example of inequality appears when we examine the treatment afforded mentally disordered sex offenders (MDSOs)." (*Moye, supra,* 22 Cal.3d at p. 463.) It noted: "The MDSO can be confined for only a limited period, measured by the maximum term for the underlying offense, unless thereafter the *People* (or other committing authority) can establish grounds for an extended commitment. In contrast, persons in petitioner's class face indefinite, lifetime confinement unless *they* can prove that their sanity has been restored." (*Id.* at pp. 464–465.) The court further concluded, "[T]he People have failed to justify the different treatment of the two classes of committed persons." (*Id.* at p. 466.)

With this context in mind, it becomes readily apparent why the Legislature in enacting Penal Code section 1026.5 would include subdivision (b)(7): The Legislature wanted to establish a commitment procedure for NGI's that would overcome the equal protection problems identified in *Moye* when it compared the treatment of NGI's and MDSO's. Therefore, it included in the NGI commitment law the identical language it had included in the MDSO law, by enacting Welfare and Institutions Code former section 6316.2, subdivision (e): the person subject to commitment "shall be entitled to the rights guaranteed under the Federal and State Constitutions for criminal proceedings."

As *Henderson* later concluded, however, Welfare and Institutions Code former section 6316.2, subdivision (e) was merely intended to provide the constitutional protections mandated by judicial decision, i.e., the rights to proof

beyond a reasonable doubt and a unanimous verdict, not additional rights such as the privilege against self-incrimination. It is therefore reasonable to conclude that in including the identical language in Penal Code section 1026.5(b)(7), the Legislature acted with the same intent.

To summarize, *Williams*'s nonliteral reading of section 1026.5(b)(7) is supported by (1) *Henderson*'s nonliteral reading of identical language as not guaranteeing the privilege against self-incrimination; (2) *Burnick*'s and *Bones*'s nonliteral reading of a statute specifically referring to the part of the state Constitution containing the right not to testify; (3) the circumstances under which section 1026.5(b)(7) was enacted; and (4) the fact that no decision other than *Haynie* and *Luis C.* has found the right not to testify to apply to a civil commitment proceeding.

■ That reading is further supported by the fact that, two years after *Williams* was decided, the Legislature amended section 1026.5 without modifying its language to overrule *Williams* or to state explicitly that an NGI committee has the criminal defendant's privilege not to testify. When " ' "a statute has been construed by judicial decision, and that construction is not altered by subsequent legislation, it must be presumed that the Legislature is aware of the judicial construction and approves of it." [Citations.]' " (*People v. Meloney* (2003) 30 Cal.4th 1145, 1161 [135 Cal.Rptr.2d 602, 70 P.3d 1023].)

Finally, even *Haynie* did not truly interpret section 1026.5(b)(7) literally. The court stated that "the Legislature's words clearly and unambiguously state the person 'is entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings.' " (*Haynie*, *supra*, 116 Cal.App.4th at p. 1228.) However, if the court actually meant to apply section 1026.5(b)(7) literally, it should not have engaged in any further analysis. It is beyond dispute that a criminal defendant has the right not to testify. If the *Haynie* court believed the Legislature literally intended that an NGI committee have all the rights of a criminal defendant, it should merely have decided the case on that ground without further discussion.

Instead, as noted, *Haynie* went on to state that it agreed with *Williams* that section 1026.5(b)(7) did not guarantee constitutional protections that did not have a relevant relationship to commitment proceedings. *Haynie* found such a relevant relationship in its observation that "[b]y calling the person in its case-in-chief, the state is essentially saying that his or her testimony is necessary for the state to prove its case." (*Haynie*, *supra*, 116 Cal.App.4th at p. 1230.)

■ We are not persuaded by *Haynie*'s analysis on this point. It is inconsistent with the analysis adopted by the Supreme Court in *Cramer v.*

*Tyars, supra,* 23 Cal.3d 131, in holding that the right not to testify did not apply in commitment hearings of mentally retarded persons. *Cramer* analyzed the applicability of the right not to testify not by examining whether the committee's testimony was necessary to prove the prosecution's case, but by examining the essential nature of the proceeding. Thus, the court stated: "The commitment may not reasonably be deemed punishment either in its design or purpose. It is not analogous to criminal proceedings." (*Id.* at p. 137.)

*Cramer* further stated that "the historic purpose of the privilege against being called as a witness has been to assure that the *criminal* justice system remains accusatorial, not inquisitorial. [Citations.] The extension of the privilege to an area outside the criminal justice system, in our view, would contravene both the language and purpose of the privilege." (*Cramer v. Tyars, supra,* 23 Cal.3d at pp. 137–138.)

The United States Supreme Court has similarly stated that the right not to testify emanates from the principle that "to respect the inviolability of the human personality, our accusatory system of *criminal justice* demands that the government seeking to *punish* an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." (*Miranda v. Arizona* (1966) 384 U.S. 436, 460 [16 L.Ed.2d 694, 86 S.Ct. 1602], italics added.)

■ Civil commitment, by definition, does not involve the "system of criminal justice." Thus, the courts in *Allen v. Illinois, supra,* 478 U.S. 364, 374–375 [106 S.Ct. 2988], *Cramer v. Tyars, supra,* 23 Cal.3d 131, 137, *People v. Merfeld, supra,* 57 Cal.App.4th 1440, 1446, *People v. Clark, supra,* 82 Cal.App.4th 1072, 1079, and *People v. Leonard, supra,* 78 Cal.App.4th 776, 792–793, all held that the right not to testify does not apply in civil commitment proceedings because they are not criminal proceedings, do not involve adjudication of guilt, and do not result in punishment. The conclusion of the court in *Haynie* and *Lucis C.* that civil committees do have the right not to testify is inconsistent with these decisions.

■ For these reasons, we conclude the Legislature in enacting Penal Code section 1026.5(b)(7) and Welfare and Institutions Code section 1801.5 did not intend to require that persons subject to commitment under those provisions have the right not to testify. That being the case, there is no disparate treatment in not affording that right to MDO committees, and the premise of Lopez's equal protection argument fails on the merits.

B. *Evidence Code section 352*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

\*See footnote, *ante,* page 1099.

## III

## DISPOSITION

The judgment is affirmed.

McKinster, Acting P. J., and Gaut, J., concurred.

A petition for a rehearing was denied April 24, 2006, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 12, 2006, S143055. Kennard, J., was of the opinion that the petition should be granted.