Filed 5/19/14  P. v. Reichlein CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DANA DAY REICHLEIN,<br><br>        Defendant and Appellant. | E058873<br><br>(Super.Ct.No. BLF002035)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Thomas E. Kelly, Judge. (Retired judge of the Santa Cruz Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Dana Day Reichlein was receiving treatment in a state hospital as a mentally disordered offender (MDO) as part of his parole, and the People petitioned to extend his commitment for another year pursuant to Penal Code sections 2970 and 2972.[1]  A jury found true beyond a reasonable doubt:  (1) Reichlein suffered from a severe mental disorder, (2) his severe mental disorder was not in remission, and (3) he posed a substantial danger to others because of his severe mental disorder. Therefore, the trial court ordered Reichlein to receive treatment as an MDO for an additional year.

In this appeal from the commitment order, Reichlein contends the trial court erred by permitting the People to call him as a witness without first inquiring into his competency to testify.  According to Reichlein, because he was incapable of expressing himself clearly and was incapable of understanding his duty to tell the truth, he was disqualified from testifying under Evidence Code section 701, subdivision (a).  The People contend Evidence Code section 701 does not apply to MDOs, but even if it does, the trial court did not prejudicially abuse its discretion by permitting Reichlein to be called to the stand.

Assuming Evidence Code section 701 does apply generally to MDO proceedings, we conclude the trial court correctly permitted the People to call Reichlein to the stand. Reichlein was not disqualified from providing testimony about his mental state, as

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

opposed to testifying about facts relating to a specific incident, from which the jury could conclude he continued to pose a substantial danger to others due to his severe mental disorder. The commitment order is affirmed.

## I.

## FACTS

A.     *Background to the Petition to Extend Reichlein's Commitment*

By information filed on September 25, 2002, the People charged Reichlein with attempted first degree murder of a peace officer (§§ 664, 187, count 1), battery on a peace officer (§ 243, subd. (c)(2), count 2), and unlawfully taking a firearm from a peace officer (§ 148, subd. (b), count 3). Reichlein pleaded not guilty to all counts, but then withdrew his not guilty plea and entered a plea of not guilty by reason of insanity. The trial court ordered Reichlein to be examined and, thereafter, set a hearing on Reichlein's mental competency pursuant to section 1369.

After reviewing the reports of Reichlein's mental examinations, the trial court found Reichlein was competent to stand trial. The court then granted the People's oral motion to amend count 1 to attempted second degree murder and arraigned Reichlein on the amended count. Reichlein pleaded guilty to the amended count 1, which the court accepted, and the court granted the People's motion to dismiss the remaining counts in the interest of justice. The court thereafter sentenced him to state prison for the upper term of nine years.

While serving his prison sentence, on October 15, 2009, Reichlein was transferred to Atascadero State Hospital (Atascadero) for treatment as a mentally ill inmate. (§ 2684.) On May 30, 2010, Reichlein was held for treatment at Atascadero as an MDO during his period of parole. (§ 2962.) Reichlein's parole was set to expire on May 30, 2013, but based on an evaluation of him conducted on September 10, 2012, and on a review of his records, the medical director of Atascadero recommended a petition be filed under section 2970 to commit Reichlein for treatment for another year. In particular, the director concluded Reichlein had a severe mental disorder as defined in section 2962, the symptoms of which were no longer in remission, and he posed a substantial danger of causing physical harm to others. On March 14, 2013, the People filed a petition under section 2970 to extend Reichlein's commitment.

B.     *In Limine Hearing on Reichlein's Proposed Testimony*

During a discussion of in limine motions, Reichlein's appointed counsel objected to the People calling Reichlein as a witness. The prosecutor argued Reichlein had no right to refuse to testify and to answer nonincriminating questions, and informed the court MDOs are routinely called as witnesses at their commitment hearings. Reichlein's testimony, according to the prosecutor, was relevant and necessary to establish his dangerousness. In particular, the prosecutor told the court she intended to ask Reichlein about "his viewpoint or what his recollection and what his thinking was during [the] attempted murder to show that he doesn't have the rational ability to determine what is a real threat to him and what is not a real threat to him, and he's a substantial danger to others."

4

Reichlein's attorney responded Reichlein was not qualified to testify under Evidence Code section 701. Counsel told the court of his observations of Reichlein during the hearing so far—that counsel "had difficulty hearing what's going on in the courtroom because [Reichlein] continuously with almost rare cessation mumbl[ed] incoherently," and that Reichlein reacted inappropriately to statements from others. According to counsel, Reichlein did not understand what was happening around him and could not answer his attorney's questions. If Reichlein were called to the stand, his attorney argued, he would be incapable of answering questions about his arrest over a decade earlier, and there would be "no way to probe his ability to tell the truth." In the alternative, counsel argued the court should preclude Reichlein from testifying under Evidence Code section 352 because the probative value of his testimony would be substantially outweighed by the undue consumption of time and the prejudice it would entail.

The prosecutor replied Evidence Code section 701 did not appear to apply to MDO hearings, and Reichlein's testimony should not be excluded under Evidence Code section 352. According to the prosecutor, Reichlein's brief testimony would be probative and the jury should be "able to see how his mind works as perceiving threats or risks to him," to establish his current dangerousness.

The trial court concluded Evidence Code section 701 did not apply "because here the issue is the mental makeup of the witness, not whether the witness is capable of telling the truth or not." The jury, according to the court, had to determine whether Reichlein posed a substantial danger, "[a]nd certainly, watching him process questions

5

and respond[] is totally relevant in that endeavor." In light of the prosecutor's assurance Reichlein's examination would only take a few minutes, the court concluded the likely probative value of his testimony would not be outweighed by undue consumption of time, for purposes of Evidence Code section 352.

C.  *Expert Testimony*

Dr. Kwartner, a clinical psychologist employed in the forensic services department at Atascadero, testified she met with Reichlein multiple times, and she reviewed all records pertaining to Reichlein's treatment at Atascadero and records pertaining to his criminal history. In Dr. Kwartner's professional opinion, Reichlein suffered from paranoid schizophrenia. Dr. Kwartner testified paranoid schizophrenia is a mental illness that includes psychotic symptoms, and that Reichlein experienced auditory hallucinations and delusions.

With respect to Reichlein's delusions, Dr. Kwartner testified he had "grandiose beliefs" of having been the president, a justice of the Supreme Court, James Bond (in a past life), and, despite being only 47 years old, having been a doctor for 30 years. Reichlein also believed he served in the Civil War and Second World War as an officer and a general. Dr. Kwartner also testified Reichlein suffered from persecutory delusions, and believed "the staff at the hospital [were] conspiring to steal his money, that his parents stole his inheritance, [and] that his food [was] being poisoned." Moreover, Reichlein had addict delusions that pertained to his body, and believed he had spiders in his body and that he suffered from amenorrhea, which is part of the female menstrual cycle. Finally, Dr. Kwartner testified Reichlein had "bizarre delusions about his

6

identity," and believed he had died and come back to life numerous times. Reichlein spoke freely and openly about his delusions, but he had "disorganized thought processes and behavior," and his speech was difficult to follow because he would jump from one topic to another.

Dr. Kwartner testified Reichlein's paranoid schizophrenia affected his perception of reality, his thought process, his ability to communicate, and his ability to socialize and get along with others. Because of his persecutory delusions, Reichlein tended to isolate himself from other patients at the hospital.

With respect to Reichlein's underlying conviction for attempted second degree murder, Dr. Kwartner testified Reichlein was pulled over on the side of a highway and an officer with the California Highway Patrol (CHP) stopped to investigate. Reichlein asked the officer if he could turn around on the highway, and the officer told him he could not. Reichlein then asked the officer about a rest stop, and the officer told him to continue driving in the direction he was going. Rather than continue on his way, Reichlein made an illegal U-turn in a roundabout that was exclusively for police and other emergency vehicles, so the officer pulled him over. When Reichlein did not comply with the officer's commands, the officer called for backup and pepper sprayed him. Notwithstanding being pepper sprayed, Reichlein lunged at the officer and tackled him to the ground, where Reichlein pinned the officer down with the officer's baton and tried to strangle the officer with the microphone cord to the officer's radio. Two CHP officers who arrived to assist had to kick and beat Reichlein with their batons for some time before they could subdue him.

7

According to Dr. Kwartner, the facts of the 2001 episode indicated Reichlein was suffering from paranoid schizophrenia at the time. From her review of the police reports, Dr. Kwartner concluded Reichlein was disoriented and confused because, although the officer told him there was a rest stop a few miles ahead, he made an illegal turnaround. Other indications of Reichlein's paranoid schizophrenia were that he quickly became agitated when the officer called for backup, he had difficulty maintaining his train of thought after being placed under arrest, and he spoke in a disorganized and illogical fashion to the officers. Reichlein told the officers he was permitted to use the turnaround because he too was driving an emergency vehicle, which Dr. Kwartner testified was consistent with Reichlein's grandiose delusions and belief he was above the law.

Dr. Kwartner opined Reichlein's severe mental illness was not in remission at the time of the hearing. Hospital staff had to prompt him to groom himself and to maintain his hygiene, and in the prior year he was on a mandatory shower schedule. From 2006 until 2012, Reichlein was under a court order to be given his medications involuntarily because he refused to take them, and his failure to take the medications caused him to be a danger to others. At the time of the hearing, Reichlein was no longer being given his medication by force, but he was still on a compliance level, meaning hospital staff crushed his oral medications and put them in liquid to ensure he actually ingested them. Dr. Kwartner testified she was concerned about Reichlein's "willingness to take all the steps necessary in order to obtain medication in the community setting, as far as paying for it, getting to a community mental health center to pick it up on a monthly basis, getting refills, calling a doctor if symptoms get worse to kind of readjust, and making

8

sure he takes it on a regular basis." Dr. Kwartner thought Reichlein was in remission from June 2010 to September 2012, but he decompensated and his symptoms became worse. Because of his relapse, Reichlein's dosage of Zyprexa—an antipsycohotic medication which manages hallucinations and a patient's ability to respond to internal stimuli—was increased to the maximum dosage.

Dr. Kwartner testified about two additional instances when Reichlein acted in a manner that posed a danger to others. In August 2004, while Reichlein was still in prison, he stopped taking his medications. In a psychiatrically unstable and psychotic state, he stabbed a fellow prisoner in the back and the back of the head with a pencil. As a result of that incident, Reichlein received a prison infraction and a court issued an order that he be involuntarily medicated. In the second incident, which occurred in December 2010 while he was in Atascadero, Reichlein was observed talking to himself and engaging in bizarre behavior in the dining hall. Later that day, he "acted on a delusional belief" toward a psychiatric technician student who was measuring patients' vital signs with a blood pressure machine manufactured by Welch Allyn. Reichlein insisted he was Welch Allyn, and in an agitated state he tried to take the machine away from the student. During the struggle, Reichlein physically threatened the student and had to be restrained by officers.

Based on her review of the police report from Reichlein's 2001 arrest, and based on her review of his violent incidents in prison and Atascadero, Dr. Kwartner opined Reichlein continued to represent a substantial danger of physical harm to others because of his severe mental disorder that was not in remission.

9

On cross-examination, Dr. Kwartner testified that, in her review of Reichlein's records, she found no incidents of him acting violently in Atascadero other than in December 2010. Reichlein's attorney asked if the absence of other violent episodes by Reichlein, when he was not in remission, meant he did not act violently while experiencing the symptoms of his mental illness. Dr. Kwartner answered, "That's correct, in a controlled environment like the hospital, [a] maximum security hospital." Dr. Kwartner testified she spoke to Reichlein in February 2013. At the time, he was uncooperative, seemed agitated, he mumbled, and was distracted. Dr. Kwartner testified she spoke to Reichlein a number of times about his 2001 arrest and, although he acknowledged being involved in the altercation with the CHP officer, Reichlein's description of the incident varied significantly depending on the severity of his symptoms at the time of these conversations.

Finally, on cross-examination, Dr. Kwartner testified her opinion of Reichlein's continued dangerousness was not based solely on his serious psychiatric condition and his symptoms, but based also on his history of violent incidents, which occurred during psychotic episodes in a variety of settings—in the community, in prison, and in the hospital.

D. *Reichlein's Testimony*

The People called Reichlein to the stand, but before the clerk could administer the oath, Reichlein exclaimed, in apparent reference to the CHP officer, "He was molesting children, of course, but who cares? I do—someone else." The clerk then asked him, "You do solemnly state that the testimony you shall give in this matter shall be the truth,

10

the whole truth, and nothing but the truth, so help you God?" Reichlein answered, "God does help me. Thank you."

When asked by the prosecutor to state his name for the record, Reichlein stated, "You say my name Richland or Reichland [phonetic]. You're close. That's kingship, and they have accepted me as king, but that's America. Germany is in control." The prosecutor asked Reichlein about his earlier, unreported statements in court about being a general in the Second World War, and asked him if he killed anyone during the war. Reichlein responded, "No. Orders for protection of children is privacy. That's why." The prosecutor then asked him, "So you didn't kill anybody in the Civil War either?" Reichlein responded, "I do not know exclusions about pain of blood or blood of pain, but it's the same thing, no, no."

The prosecutor asked Reichlein if he remembered the CHP officer he attacked in 2001. He answered, "Memories—I admitted I killed him. I said that earlier. He was hurting my friend." Reichlein's attorney objected when the prosecutor asked if Reichlein remembered the officer he strangled with a microphone cord, but Reichlein blurted out, "Not objection. He did need to be taken down." Reichlein also said of the officer, "He did desire dueling pistols. I don't want to duel with a person with a BB gun, or whatever the fuck. It's just, whatever, he's challenging—I—my sister involved with sex for molesting children and stuff and dead people. I don't really give a fuck anymore. I just want to be an old man." The prosecutor next asked Reichlein if he believed the CHP officer was molesting children and needed to be taken down. Reichlein responded, "No. Yeah, both. But now listen, children are precious. One seed. Now, think of the size of

11

the seed—now, that's huge. That's God's love, and it's good." Reichlein's attorney moved to exclude the testimony, but the trial court denied the motion.

On cross-examination, Reichlein's attorney asked if he was thirsty. Reichlein responded, "Purety [*sic*] context—grow in something however many—many." When asked if he had "anything against the lady back there?" apparently in reference to Dr. Kwartner, Reichlein spoke an unintelligible diatribe.

E. *Jury Instructions and Findings*

Although Reichlein did not dispute he suffered from a severe mental disorder that was not in remission, and only contested his continued dangerousness to others, the trial court properly instructed the jury it had to find all three elements true beyond a reasonable doubt for it to conclude Reichlein was an MDO.

The jury returned a verdict finding true the allegation that Reichlein was an MDO, within the meaning of sections 2970 and 2972. Based on the jury's finding, the trial court issued an order that Reichlein continue receiving treatment as a MDO at Atascadero, until May 30, 2014.

Reichlein timely appealed.

## II.

## DISCUSSION

Reichlein contends he was incapable of expressing himself and of understanding his duty to tell the truth and, therefore, he was disqualified from testifying under Evidence Code section 701, subdivision (a).[2] The People respond Reichlein cites no authority for the proposition that Evidence Code section 701 applies to MDO commitment hearings, but even if it does, the trial court did not err prejudicially by overruling defense counsel's objections to Reichlein testifying.

True, Reichlein cites no authority supporting application of Evidence Code section 701 to an MDO proceeding, and we have found none. But by the same token, we have found no authority for the opposite proposition, and in general the Evidence Code has been applied to such proceedings. (See, e.g., *People v. Nelson* (2012) 209 Cal.App.4th 698, 707-714 (*Nelson*) [addressing admissibility of interdisciplinary notes under business records or public records hearsay exceptions in MDO hearing].) Rather than reach the broader question of whether Evidence Code section 701 applies to MDOs, we assume it does apply but conclude Reichlein was not disqualified from testifying.

---

[2] On appeal, Reichlein no longer contends his testimony should have been excluded under Evidence Code section 352.

## A.    *Disqualification of Mentally Ill Witnesses*

We must affirm a trial court's ruling on the competency of a witness under Evidence Code section 701 "in the absence of a clear abuse of discretion." (*People v. Gonzalez* (2012) 54 Cal.4th 1234, 1265, citing *People v. Avila* (2006) 38 Cal.4th 491, 589.)

"Under pre-1965 statutes, all persons were qualified to testify who could 'perceive[] and . . . make known their perceptions to others' (Code Civ. Proc., former § 1879, enacted 1872 and repealed by Stats. 1965, ch. 299, § 62, p. 1361), except that persons 'of unsound mind' (*id.*, former § 1880, subd. 1, enacted 1872 and repealed by Stats. 1965, ch. 299, § 63, p. 1361) . . . could not be witnesses." (*People v. Anderson* (2001) 25 Cal.4th 543, 571 (*Anderson*).) The former law did "not impose an absolute disqualification on insane persons" (*People v. McCaughan* (1957) 49 Cal.2d 409, 419 (*McCaughan*)), and "[t]he fact that [the proposed witness] had once been committed for insanity [was] not conclusive [about the witness's qualification to testify] at a later date" (*People v. Horowitz* (1945) 70 Cal.App.2d 675, 696).

A person "of unsound mind" was disqualified from testifying under prior law if his "mental derangement or defect [was] such that he was deprived of the ability to perceive the event about which he [was] to testify or [was] deprived of the ability to recollect and communicate with reference thereto. [Citations.]" (*McCaughan*, *supra*, 49 Cal.2d at p. 420.) The Supreme Court noted that, although Code of Civil Procedure former section 1880 was "addressed to the time at which a witness [was] produced for examination," the court held "[i]t [was] apparent from the requirement that the witness

14

[had] the ability to give a substantially accurate account of the event witnessed [citations] that he must have had the ability to perceive the event with a substantial degree of accuracy." (*McCaughan*, at p. 420.) "It follows that if the proposed witness was suffering from some insane delusion or other mental defect that deprived him of the ability to perceive the event about which it [was] proposed that he testify, he [was] incompetent to testify about that event." (*Id*. at p. 421.) "[S]ound discretion demand[ed] the exercise of great caution in qualifying as competent a witness who [had] a history of insane delusions relating to the very subject of inquiry in a case in which the question [was] not simply whether or not an act was done but, rather, the manner in which it was done and in which testimony as to details [might] mean the difference between conviction and acquittal." (*Ibid*.)

"The prior rules governing the determination of testimonial competence were 'modified' by the Evidence Code, adopted in 1965. [Citation.] The effect 'may [be to] permit . . . persons suffering from mental impairment to testify in some instances where they [were previously] disqualified from testifying.' [Citation.]" (*Anderson*, *supra*, 25 Cal.4th at p. 572.) Under current law, "Except as otherwise provided by statute, every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter." (Evid. Code, § 700.) "A person is incompetent and disqualified to be a witness if he or she is '[i]ncapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him' (Evid. Code, § 701, subd. (a)(1)), or is '[i]ncapable of understanding the duty of a witness to tell the truth.' (Evid. Code, § 701, subd. (a)(2).) '[T]he burden of

15

proof is on the party who objects to the proffered witness, and a trial court's determination will be upheld in the absence of a clear abuse of discretion. [Citations.]' [Citations.] The challenging party must establish a witness's incompetency by a preponderance of the evidence. [Citations.] Unlike a witness's personal knowledge, a witness's competency to testify is determined exclusively by the court. [Citations.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 360 (*Lewis*).)

Like under the former law, "[t]he fact that a witness may have suffered from mental disorders does not by itself support the claim that he is incapable of communicating so as to be understood" under Evidence Code section 701. (*People v. Gipson* (2004) 117 Cal.App.4th 1065, 1071.) Although *McCaughan* was decided under the former evidence law, its test for determining whether a mentally ill person is disqualified from testifying is still useful. (See *Lewis*, *supra*, 26 Cal.4th at p. 356; *People v. St. Andrew* (1980) 101 Cal.App.3d 450, 457-458 & fn. 3.)

B.      *Analysis*

In determining whether Reichlein was disqualified from testifying, it is important to keep in mind the context in which he testified and the issues on which his testimony bore. "Enacted in 1985, the MDO Act requires that an offender who has been convicted of a specified felony related to a severe mental disorder and who continues to pose a danger to society receive appropriate treatment until the disorder can be kept in remission. [Citation.] 'The MDO Act has the dual purpose of protecting the public while treating severely mentally ill offenders.' [Citation.]" (*People v. Harrison* (2013) 57 Cal.4th 1211, 1218.) The only issues for the jury to determine in this proceeding were

16

whether Reichlein continued to pose a substantial danger to others because of a severe mental disorder that was not in remission.  (*Nelson*, *supra*, 209 Cal.App.4th at p. 706.)  In other words, the central issue was Reichlein's mental state, and the People could properly call him to the witness stand so the jury could hear from Reichlein himself on that issue.[3]

*McCaughan*, on which Reichlein relies, does not support disqualification in this context.  The issue there was whether, in a murder trial, mentally ill witnesses were properly qualified to testify about events they witnessed.  (*McCaughan*, *supra*, 49 Cal.2d at p. 419.)  As noted *ante*, the Supreme Court ruled the former qualification law was concerned with whether a mentally ill witness had the ability to accurately perceive an event, and if the witness was suffering from a delusion or mental defect that rendered him incapable of accurately perceiving the event, he was disqualified from testifying about it. (*Id*. at pp. 420-421.)  In determining whether the mentally ill witness was qualified to testify, the trial court had to exercise "sound discretion" when the witness had "a history of insane delusions relating to the very subject of inquiry in a case *in which the question [was] not simply whether or not an act was done but, rather, the manner in which it was done* and in which testimony as to details [might] mean the difference between conviction and acquittal."  (*Id*. at p. 421, italics added.)

---

[3] As Reichlein concedes, the privilege against self-incrimination does not prevent an MDO from "'be[ing] required to respond to nonincriminatory questioning which may [reveal] his mental condition to the jury, whose duty it [is] to determine whether he [is] [severely mentally disordered].'"  (*People v. Merfield* (1997) 57 Cal.App.4th 1440, 1446, quoting *Cramer v. Tyars* (1979) 23 Cal.3d 131, 139; see also *People v. Lopez* (2006) 137 Cal.App.4th 1099, 1106-1107 [Fourth Dist., Div. Two]; *People v. Clark* (2000) 82 Cal.App.4th 1072, 1079-1081.)

Here, the question is not whether Reichlein could clearly and accurately express himself about events he witnessed. He was not called to the stand to testify about facts or events he witnessed, such as the facts of his encounter with the CHP officer or of the other incidents Dr. Kwartner testified about. Likewise, the question is not whether Reichlein understood his duty to testify truthfully about what he witnessed. He was called to give testimony that demonstrated his mental state, and his testimony—however fanciful or confused—was relevant to determining whether he posed a substantial danger to others. The issue was not whether Reichlein's delusions were true, but whether he posed a danger because of his delusions. Reichlein was not disqualified from testifying.

Both before and after he was sworn to testify, Reichlein stated he murdered the CHP officer because he believed the officer was molesting children. This testimony was consistent with Dr. Kwartner's testimony about Reichlein's "grandiose delusions" and belief he was above the law. From this testimony, a reasonable jury could have concluded Reichlein posed a substantial danger to others because of his severe mental disorder.

Therefore, although we assume Evidence Code section 701 applies generally to witnesses in MDO proceedings, and the trial court should conduct some inquiry when a party objects to the testimony of an MDO on competency grounds, we conclude the trial court did not prejudicially abuse its discretion by overruling Reichlein's objection and permitting him to be called to testify.

## III.

## DISPOSITION

The order extending Reichlein's commitment as an MDO is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER

Acting P. J.

We concur:


KING

J.


MILLER

J.

19