Filed 7/26/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CHARLES HUDEC, | |
| Petitioner, | G047465 |
| v. | (Super. Ct. No. C47710) |
| THE SUPERIOR COURT OF ORANGE COUNTY, | O P I N I O N |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

Original proceedings; petition for a writ of prohibition/mandate to challenge an order of the Superior Court of Orange County, Kazuharu Makino, Judge. Writ granted.

Frank Ospino, Public Defender, Jean Wilkinson, Chief Deputy Public Defender, Mark Brown, Assistant Public Defender, Christopher D. McGibbons, Deputy Public Defender, for Petitioner.

Tony Rackauckas, District Attorney, Brian F. Fitzpatrick, Deputy District Attorney, for Respondent.

\*    \*    \*

Charles Hudec seeks a writ of prohibition or mandate to overturn the trial court's order granting the district attorney's motion in limine compelling him to testify in a trial to extend his commitment to Patton State Hospital (Pen. Code, § 1026.5; all statutory citations are to the Penal Code unless noted otherwise).  He relies on the Legislature's statutory command that individuals facing commitment "shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings." (*Id.*, subd. (b)(7).)  Both constitutions guarantee the familiar right in a civil or criminal case not to incriminate oneself.  (*Cramer v. Tyars* (1979) 23 Cal.3d 131, 137 (*Cramer*).)  But both constitutions afford broader protection in criminal proceedings that includes a "separate and distinct testimonial privilege[]," namely "an absolute right not to be called as a witness and not to testify."  (*Ibid.*)  Because the plain words of the statute provide that the rights afforded in criminal proceedings "shall" be afforded to individuals facing a civil commitment trial, we grant Hudec's petition.

I

FACTUAL AND PROCEDURAL BACKGROUND

This court presented the facts of the underlying case in a 1985 opinion modifying and affirming the judgment committing Hudec to Patton State Hospital. (*People v. Hudec* (Aug. 15, 1985, G000694) [nonpub opn.].)  As noted in the earlier opinion, Hudec, a paranoid schizophrenic, killed his father in May 1981 after he heard voices tell him he had to commit the killing to please God and to avoid becoming a homosexual.  The parties stipulated Hudec was not guilty by reason of insanity, and this court modified the commitment order to reflect Hudec committed voluntary manslaughter rather than first degree murder.

In March 2012, the district attorney filed the latest petition to extend Hudec's commitment to Patton Hospital under section 1026.5.  The trial court scheduled a trial on the petition and later granted the district attorney's written in limine motion to

2

compel Hudec's testimony at trial. Hudec petitioned for a writ of prohibition or mandate. We issued an order to show cause, stayed the trial, and scheduled oral argument.

II

DISCUSSION

Persons found not guilty of a felony because of legal insanity may not be committed to a state hospital longer than the maximum state prison sentence that the trial court could have imposed for the underlying offense. (§ 1026.5, subd. (a).) The district attorney may petition to extend the commitment, however, if the person "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others." (§ 1026.5, subd. (b)(1).) The trial court must advise the person named in the petition of his or her rights to an attorney and to a jury trial, and that the rules of discovery in criminal cases apply (§ 1026.5, subd. (b)(3)). "The court shall conduct a hearing on the petition for extended commitment. The trial shall be by jury unless waived by both the person and the prosecuting attorney." (§ 1026.5, subd. (b)(4).)

The issue in the current case concerns the scope of section 1026.5, subdivision (b)(7). The subsection provides: "The person shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings. All proceedings shall be in accordance with applicable constitutional guarantees."

Hudec contends section 1026.5, subdivision (b)(7), confers on him the right of a criminal defendant not to be called as a witness and not to testify. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15 ["Persons may not . . . be compelled in a criminal cause to be a witness against themselves"]; Evid. Code, § 930; *Cramer*, *supra*, 23 Cal.3d at p. 137 [in a criminal matter a defendant has an absolute right not to be called as a witness and not to testify].) The district attorney correctly notes a commitment extension proceeding is civil in nature and therefore constitutional proscriptions against compelled testimony do not apply. (*Allen v. Illinois* (1986) 478 U.S. 364, 374-375 [privilege did not

3

apply to proceedings under the Illinois Sexually Dangerous Persons Act because the proceedings were not criminal within the meaning of the Fifth Amendment to the United States Constitution]; *Cramer*, at p. 137 [same under California Constitution].) Here, we must decide whether section 1026.5, subdivision (b)(7) confers on the defendant the right to refuse to testify at a section 1026.5 extension trial.[1]

In construing section 1026.5, subdivision (b)(7), our task is to ascertain the Legislature's intent and adopt the construction that best effectuates the law's purpose. (*People v. Leiva* (2013) 56 Cal.4th 498 (*Leiva*).) We start with "'the plain, commonsense meaning of the language used by the Legislature. [Citation.] If the language is unambiguous, the plain meaning controls.' [Citation.] We consider first the words of the statute because ""'the statutory language is generally the most reliable indicator of legislative intent."" [Citation.] '[W]henever possible, significance must be given to every word [in a statute] in pursuing the legislative purpose, and the court should avoid a construction that makes some words surplusage.' [Citation.] However, [Penal Code] section 7 cautions that 'words and phrases must be construed according to the context . . . .' (§ 7, subd. 16.) Accordingly, . . . words in a statute ""'should be construed in their statutory context"'" [citation], and . . . 'we may reject a literal construction that is contrary to the legislative intent apparent in the statute or that would lead to absurd

---

[1] The district attorney argues extraordinary relief is unwarranted because Hudec has an adequate appellate remedy if the court grants the order extending his commitment. In issuing the order to show cause, we determined Hudec lacked "a plain, speedy, and adequate remedy, in the ordinary course of law." (Code Civ. Proc., § 1086; *Moore v. Superior Court* (2004) 117 Cal.App.4th 401, 405, fn. 4; *Robbins v. Superior Court* (1985) 38 Cal.3d 199, 205 [court necessarily determined appeal was not an adequate remedy when it issued alternative writ].) Denial of a claim of statutory privilege is properly reviewed by extraordinary writ. (See *Roberts v. Superior Court* (1973) 9 Cal.3d 330, 336; see also *People v. Superior Court* (*Williams*) (1991) 233 Cal.App.3d 477, 482, fn. 2 [special circumstances warrant review by mandate given the urgent nature of extension proceedings and because the trial court's ruling will impact other extension proceedings].)

4

results' [citation], or 'would result in absurd consequences that the Legislature could not have intended.' [Citation.]" (*Leiva*, *supra*, at p. 506.)

A. *People v. Haynie*

We are not the first court to grapple with this issue. In *People v. Haynie* (2004) 116 Cal.App.4th 1224 (*Haynie*), the appellate court concluded section 1026.5, subdivision (b)(7), prohibited the prosecution from calling the defendant at the commitment extension trial and questioning him about his mental state. The court explained "the Legislature's words clearly and unambiguously state the person 'is entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings.' A defendant in a criminal matter has an absolute right not to be called as a witness and not to testify. (U.S. Const., 5th Amend; Cal. Const., art. I, § 15; Evid. Code, § 930.) Under the plain language of the statute, because Haynie is entitled to the same rights guaranteed to a criminal defendant, he should not have been compelled to testify in the prosecution's case at his commitment extension trial." (*Id.* at p. 1228.)

*Haynie* agreed subdivision (b)(7) does not extend rights that "bear no relevant relationship to the proceedings." (*Haynie*, *supra*, 116 Cal.App.4th at p. 1229.) *Haynie* noted several courts had not applied all the constitutional rights guaranteed for criminal proceedings in section 1026.5 trials. (See *People v. Powell* (2004) 114 Cal.App.4th 1153, 1158 [constitutional requirement of personal waiver of jury trial; common sense dictates an insane person should not be able to veto counsel's informed tactical decision to waive jury]; *Williams*, *supra*, 233 Cal.App.3d at pp. 484-485 [double jeopardy did not bar prosecuting attorney's appeal after trial court granted nonsuit in section 1026.5 proceeding]; *People v. Juarez* (1986) 184 Cal.App.3d 570, 575 [extended commitment procedures could not disadvantage the defendant in the determination of his criminal guilt, any amendment to them could not, by definition, constitute an ex post facto violation]; *People v. Beard* (1985) 173 Cal.App.3d 1113, 1118-1119 [the defendant

5

failed to show privilege against self-incrimination violated by court-ordered psychiatric exams; no evidence questions posed by psychiatrists sought to elicit information that could subject the defendant to criminal prosecution]; *People v. Henderson* (1981) 117 Cal.App.3d 740, 748 (*Henderson*) [admission at trial of the defendant's statements to hospital staff during routine therapy sessions did not violate privilege against self-incrimination]; *People v. Poggi* (1980) 107 Cal.App.3d 581, 585-586.)

But *Haynie* disagreed subdivision (b)(7) "'merely codifies the application of constitutional protections to extension hearings mandated by judicial decision.'" (*Haynie*, *supra*, 116 Cal.App.4th at p. 1230; see *Williams*, *supra*, 233 Cal.App.3d at p. 488.) *Haynie* stated that "if the courts have granted rights to committees under case law, there is no need for the statutory declaration of rights—it is surplusage. Second, that [construction] supplants the legislative rights-inclusive language with a process whereby judges select which rights will apply. We prefer to leave it to the Legislature to be more specific as to which rights apply if it does not intend that all rights apply. . . . Finally, to the extent that case law holds that certain rights apply to extended-commitment proceedings under constitutional principles, those holdings do not prevent the Legislature from providing additional rights to civil committees." (*Haynie*, *supra*, 116 Cal.App.4th at p. 1230.)

*Haynie* concluded the right against compelled testimony "is clearly and relevantly implicated when a person is called by the state to testify in a proceeding to recommit him or her even if what is said on the witness stand is not per se incriminating. By calling the person in its case-in-chief, the state is essentially saying that his or her testimony is necessary for the state to prove its case. We have no doubt that a committee so compelled to testify is prejudiced under these circumstances." (*Haynie*, *supra*, 116 Cal.App.4th at p. 1230.)

The *Haynie* court decided *In re Luis C.* (2004) 116 Cal.App.4th 1397, about a week later. *Luis C.* held Welfare and Institutions Code section 1801.5, which pertains

6

to analogous recommitment trials involving persons within the control of the Division of Juvenile Facilities, granted the person the right not to testify. A panel of this court later agreed in *Joshua D. v. Superior Court* (2007) 157 Cal.App.4th 549 (*Joshua D.*)[2], although the court emphasized section 1801.5 extends "all" rights guaranteed under the federal and state constitutions in criminal proceedings, which is arguably broader than the language in section 1026.5. (*Id.* at pp. 557, 560.)[3] *Joshua D.* concluded the right not to testify "is necessarily included in the rights afforded by section 1801.5 because the word 'all' means 'all' and not 'some.' The Legislature's chosen term leaves no room for judicial construction." (*Id.* at p. 558; see also *In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1510 [section 1801.5 unambiguously includes prohibition against double jeopardy].)

Joshua D. also noted the Legislature had amended section 1801.5 after *Luis C.* without changing the "'all rights'" language. (*Joshua D., supra*, 157 Cal.App.4th at pp. 560-561.) "It is a well-established principle of statutory construction that when the Legislature amends a statute without altering portions of the provision that have been judicially construed, the Legislature is presumed to have been aware of and to have

---

[2]      We initially denied the petition in *Joshua D.*, but the California Supreme Court granted review and transferred the matter directing us to issue an order to show cause why the petition should not be granted.

[3]      Welfare and Institutions Code section 1801.5 provides: "The person shall be entitled to all rights guaranteed under the federal and state constitutions in criminal proceedings. A unanimous jury verdict shall be required in any jury trial. As to either a court or a jury trial, the standard of proof shall be that of proof beyond a reasonable doubt." The Legislature added the "'all rights'" language in 1984 following the decision in *People v. Superior Court* (*Vernal D.*) (1983) 142 Cal.App.3d 29, which held the Welfare and Institutions Code section 1800 et seq. commitment scheme violated due process by authorizing commitment based on less than a unanimous jury verdict and by implying the civil preponderance of the evidence standard applied. (See *Joshua D., supra,* 157 Cal.App.4th at pp. 559-560.)

acquiesced in the previous judicial construction." (*Marina Point Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 734.)

B.      *People v. Lopez*

*People v. Lopez* (2006) 137 Cal.App.4th 1099 (*Lopez*) disagreed with the *Haynie* court's analysis. *Lopez* considered an equal protection challenge raised by a defendant civilly committed as a mentally disordered offender (MDO). (See § 2960 et seq.) Section 2972, the statute governing the procedures for hearing these petitions, provides the committee with the right to a jury trial, assisted by appointed counsel if indigent, and requires proof beyond a reasonable doubt and jury unanimity. But section 2972 does not contain the language found in section 1026.5, subdivision (b)(7) (or Welf. & Inst. Code, §1801.5) entitling the person to rights guaranteed under the federal and state Constitutions for criminal proceedings.

In *Lopez*, the defendant argued admission of testimony from a prior MDO commitment hearing where he had been compelled to testify subjected him to disparate treatment compared to section 1026.5 and Welfare and Institutions Code section 1801.5 committees. (*Lopez, supra,* 137 Cal.App.4th at pp. 1105-1106.) He argued MDOs must be afforded the same rights as committees found not guilty by reason of insanity (NGI), including the right to refuse to testify per *Haynie* and *Luis C.*

*Lopez* noted courts previously had held the right against self-incrimination did not apply in proceedings under the MDO law and other civil commitment statutes. (*People v. Merfeld* (1997) 57 Cal.App.4th 1440, 1446; *People v. Clark* (2000) 82 Cal.App.4th 1072, 1079 [requiring MDO to testify about her actions and mental condition during underlying offense did not violate her privilege against self-incrimination]; see also *People v. Leonard* (2000) 78 Cal.App.4th 776, 781, 792–793 [defendant in proceeding under Sexually Violent Predator (SVP) Act (Welf. & Inst.

8

Code, § 6600 et seq.) had no constitutional right not to be called as a prosecution witness].)

*Lopez* faulted *Haynie* for failing to follow *Henderson*, *supra*, 117 Cal.App.3d 740. *Henderson* involved a proceeding to extend the defendant's commitment under the now-repealed mentally disordered sex offenders (MDSO) law (Welf. & Inst. Code, former § 6300 et seq.). Former Welfare and Institutions Code section 6316.2, subdivision (e) of the MDSO law contained language almost identical to that found in section 1026.5, subdivision (b)(7): "The patient shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings. All proceedings shall be in accordance with applicable constitutional guarantees."

In *Henderson*, the patient complained admission into evidence of his statements to hospital staff violated his statutory right (former § 6316.2, subd. (e)) to the constitutional privilege against self-incrimination. *Henderson* disagreed: "We do not so read the command of the statute. Subdivision (e) of section 6316.2 codifies the application of constitutional protections to MDSO proceedings mandated by judicial decision (see, e.g., [*People v. Burnick* (1975) 14 Cal.3d 306, 314, 324 (*Burnick*) and *People v. Feagley* (1975) 14 Cal.3d 338, 359 (*Feagley*)]). It does not extend the protection of the constitutional privileges against self-incrimination to testimonial communications which are not incriminatory." (*Henderson*, *supra*, 117 Cal.App.3d at p. 748.)

*Henderson* cited *Burnick* and *Feagley* as examples of judicial decisions applying certain constitutional protections mandated by due process. For instance, *Burnick* concluded due process required the government to prove the MDSO allegations by proof beyond a reasonable doubt. *Feagley* held due process required a unanimous verdict where the alleged MDSO was tried by a jury and that confining an MDSO indefinitely to prison where the offender has been deemed unamenable to treatment was cruel and unusual punishment. (See *Henderson*, *supra*, 117 Cal.App.3d at pp. 746-747.)

9

*Lopez* also relied on *Conservatorship of Bones* (1987) 189 Cal.App.3d 1010, 1013 (*Bones*), which dealt with the procedures used in determining whether to temporarily commit a person alleged to pose "a demonstrated danger of inflicting substantial physical harm upon others" (Welf. & Inst. Code, § 5304, subd. (a)(1)). These procedures were adopted as part of the Lanterman-Petris-Short Act (LPS), which prescribed standards for involuntary civil commitments for psychiatric treatment. Welfare and Institutions Code Section 5303 required LPS hearings to be conducted "in accordance with constitutional guarantees of due process of law and the procedures required under Section 13 of Article 1" of the State Constitution.

When Welfare and Institutions Code section 5303 was adopted, section 13 of the Constitution "enumerated various procedural safeguards guaranteed to criminal defendants," including the following: "'No person shall be . . . compelled, in any criminal case, to be a witness against himself, nor be deprived of life, liberty, or property without due process of law.'" (*Bones, supra,* 189 Cal.App.3d at p. 1016.) In 1974, the Legislature repealed section 13 and transposed the rights described in section 13 to other sections of the Constitution. The right not to be compelled to testify and the guarantee against double jeopardy migrated to article I, section 7, while the due process clause moved to article I, section 15. (*Ibid.*)

The *Bones* court concluded the Legislature, in guaranteeing the rights enumerated in section 13, and subsequently moved to sections 7 and 15, did not intend to grant potential LPS committees a privilege not to testify. The *Bones* court based its holding on its interpretation of a footnote in the Supreme Court's opinion in *Burnick*.

The issue in *Burnick* was whether the federal and state due process clauses required proof beyond a reasonable doubt in MDSO proceedings. (*Burnick*, *supra*, 14 Cal.3d at p. 310.) *Burnick* explained the question of the proper standard of proof "is not answered by the People's reliance on the general proposition that mentally disordered sex offender proceedings are 'civil in nature.' [Citation.] Nor is it necessary to inquire into

10

the constitutionality of the quoted language of [Welfare and Institutions Code] section 6321 or Evidence Code section 115.  Rather we apply those statutes, and proceed to determine whether the standard of proof beyond a reasonable doubt is 'otherwise required' in mentally disordered sex offender proceedings.  Yet in so doing we are moved by constitutional considerations of the highest order, inasmuch as we discharge our duty to insure that no person be deprived of his liberty without the due process of law guaranteed by article I, section 7, subdivision (a), of the California Constitution, and the Fourteenth Amendment to the United States Constitution." (*Burnick*, *supra*, 14 Cal.3d at p. 314, fn. omitted.)

In a footnote, *Burnick* noted, "Similarly, the Legislature has not specified the standard of proof for involuntary commitment of persons under our general mental health law (Welf. & Inst. Code, § 5000 et seq., known as the Lanterman-Petris-Short Act), but has provided that such proceedings shall be conducted 'in accordance with constitutional guarantees of due process of law and the procedures required under Section 13 [now § 7, subd. (a)] of Article 1 of the Constitution of the State of California.' (§ 5303.)  As in the case at bar, it will be for the courts to decide which standard of proof is necessary to comport with those 'guarantees and procedures' in view of the consequences to the individual of a commitment under the Lanterman-Petris-Short Act." (*Burnick*, *supra*, 14 Cal.3d at p. 314, fn. 5.)

*Bones* concluded *Burnick*'s reference in this footnote to section 7 but not section 15 demonstrated Welfare and Institutions Code section 5303 merely incorporated due process principles found in section 7 and not the panoply of criminal defense rights found in section 15.  (*Bones, supra,* 189 Cal.App.3d at p. 1016.)

*Lopez* accepted without question *Bones*'s interpretation of the *Burnick* footnote, explaining that "*Burnick* as interpreted in *Bones* . . . affects our analysis in the following way:  The Supreme Court in *Burnick apparently* concluded that, despite the Legislature's reference in Welfare and Institutions Code section 5303 to 'the procedures

required under' the part of the constitution containing the right not to testify, the Legislature did not intend that a potential LPS committee have the right not to testify. Rather, the Legislature meant only to afford the committee the rights guaranteed by due process, i.e., the rights to proof beyond a reasonable doubt and a unanimous jury. [¶] *If that conclusion is correct*, then it is reasonable also to conclude the Legislature acted with the same intent in enacting section 1026.5(b)(7). That is, in granting a potential NGI committee "the rights guaranteed under the federal and State Constitutions for criminal proceedings," the Legislature intended to grant the rights guaranteed by due process, such as proof beyond a reasonable doubt and a unanimous verdict, but not other rights that are granted criminal defendants alone, such as the privilege not to testify." (*Lopez, supra,* 137 Cal.App.4th at pp. 1113-1114, italics added.)

*Lopez* cited due process case law contemporaneous with the adoption of section 1026.5, subdivision (b)(7), to support its conclusion the Legislature did not intend to grant potential committees the right not to testify. Before 1979, the Legislature had not enacted commitment procedures for individuals acquitted by reason of insanity. Because these individuals faced indefinite commitment exceeding the maximum possible prison term had they been convicted, and the Legislature had enacted less onerous civil commitment procedures for similarly situated individuals in MDSO proceedings, the Supreme Court in *In re Moye* (1978) 22 Cal.3d 457 (*Moye*) concluded indefinite commitment of NGI defendants violated equal protection.

*Lopez* reasoned, "With this context in mind, it becomes readily apparent why the Legislature in enacting Penal Code section 1026.5 would include subdivision (b)(7): The Legislature wanted to establish a commitment procedure for NGI's that would overcome the equal protection problems identified in *Moye* when it compared the treatment of NGI's and MDSO's. Therefore, it included in the NGI commitment law the identical language it had included in the MDSO law, by enacting Welfare and Institutions Code former section 6316.2, subdivision (e): the person subject

12

to commitment 'shall be entitled to the rights guaranteed under the Federal and State Constitutions for criminal proceedings.' [¶] As *Henderson* later concluded, however, Welfare and Institutions Code former section 6316.2, subdivision (e) was merely intended to provide the constitutional protections mandated by judicial decision, i.e., the rights to proof beyond a reasonable doubt and a unanimous verdict, not additional rights such as the privilege against self-incrimination. It is therefore reasonable to conclude that in including the identical language in Penal Code section 1026.5(b)(7), the Legislature acted with the same intent." (*Lopez, supra,* 137 Cal.App.4th at pp. 1114-1115.)

*Lopez* concluded its reading of section 1026.5(b)(7) was "supported by (1) *Henderson's* nonliteral reading of identical language as not guaranteeing the privilege against self-incrimination; (2) *Burnick's* and *Bones's* nonliteral reading of a statute specifically referring to the part of the state Constitution containing the right not to testify; (3) the circumstances under which section 1026.5(b)(7) was enacted; and (4) the fact that no decision other than *Haynie* and *Luis C.* has found the right not to testify to apply to a civil commitment proceeding. [¶] That reading is further supported by the fact that, two years after *Williams* was decided, the Legislature amended section 1026.5 without modifying its language to overrule *Williams* or to state explicitly that an NGI committee has the criminal defendant's privilege not to testify." (*Lopez, supra,* 137 Cal.App.4th at p. 1115.)

Focusing on the absence of a constitutional right to refuse to testify in civil proceedings, *Lopez* viewed *Haynie* as inconsistent with *Cramer*, *supra,* 23 Cal.3d 131, which found no bar to the district attorney calling a mentally disabled person to testify at his own commitment hearing under former Welfare and Institutions Code section 6502. *Lopez* noted *Cramer's* analysis centered on the essential nature of civil commitment, which "may not reasonably be deemed punishment either in its design or purpose. It is not analogous to criminal proceedings." (*Lopez, supra*, 137 Cal.App.4th at p. 1116.) Because "'the historic purpose of the privilege against being called as a witness has been

13

to assure that the *criminal* justice system remains accusatorial, not inquisitorial," the high court in *Cramer* concluded the "extension of the privilege to an area outside the criminal justice system, in our view, would contravene both the language and purpose of the privilege." (*Cramer*, at pp. 137-138.) According to *Lopez*, because "[c]ivil commitment, by definition, does not involve the 'system of criminal justice,'" and therefore does not implicate a constitutional right to refuse to testify, "[t]he conclusion of the court[s] in *Haynie* and *Luis C.* that civil committees do have the right not to testify is inconsistent with" the decisions in *Allen, Cramer, Merfeld, Clark,* and *Leonard* holding the "right not to testify does not apply in civil commitment proceedings, because they are not criminal proceedings, do not involve adjudication of guilt, and do not result in punishment." (*Lopez,* at p. 1116.)

C.      *Analysis*

We agree with *Haynie* subdivision (b)(7) bars the prosecution from calling the defendant as a witness in a section 1026.5 commitment extension hearing. In reaching the opposite result, *Lopez* leans heavily on policy arguments, with scant attention to the statutory language. But "'"[i]t still remains true, as it always has, that there can be no intent in a statute not expressed in its words, and there can be no intent upon the part of the framers of such a statute which does not find expression in their words." [Citations.] . . . "Words may not be inserted in a statute under the guise of interpretation." [Citation.]'" (*People Ex Rel. Allstate Insurance Co. v. Muhyeldin* (2003) 112 Cal.App.4th 604, 611.) "'In other words, the courts "may not, under the guise of construction, rewrite the law or give the words an effect different from the plain and direct import of the terms used."' [Citation.]" (*California School Employees Assn. v. Governing Bd. of South Orange County Community College Dist.* (2004) 124 Cal.App.4th 574, 584.)

14

Here, the Legislature bestowed upon potential committees "*the* rights guaranteed under the federal and State Constitutions *for criminal proceedings*, not "*some* of the rights," or "the due process rights required by judicial decision in commitment extension proceedings." The Legislature's words here are not ambiguous and, of course, demonstrate its intent. We are bound by the plain meaning of these words and may not by judicial fiat adopt an interpretation at odds with that of the Legislature. (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 919 [statute's "plain meaning controls" and obviates "resort to extrinsic sources to determine the Legislature's intent"].)

Our reading does not contravene any legislative intent apparent in the statute, nor does it lead to absurd results or consequences the Legislature could not have intended. A person subject to extended commitment under section 1026.5 faces the prospect of a loss of liberty akin to that associated with incarceration following a criminal trial. (See *Burnick*, *supra*, 14 Cal.3d at p. 321; *In re Gault* (1967) 387 U.S. 1, 50 ["commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called 'criminal' or 'civil'"].) As we noted in *Joshua D.*, the privilege not to testify reflects fundamental values and aspirations and a "'sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load" . . .; [and] 'our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life. . . .' . . .""" (*Joshua D.*, *supra*, 157 Cal.App.4th at p. 565, quoting *Murphy v. Waterfront Com'n* (1964) 378 U.S. 52, 55; overruled on another point in *United States v. Balsys* (1998) 524 U.S. 666, 687.)~**(check cite)**~ We therefore cannot agree with *Lopez* the right not to testify has no meaningful application in a section 1026.5 proceeding. It is not our province to second-guess the

15

Legislature's policy choices by allowing the prosecution to call the defendant committee as a witness.

Adopting *Lopez*'s rationale in denying a committee the right not to testify in commitment extension hearings would produce an anomalous contrast with juvenile commitment extensions under Welfare and Institutions Code section 1801.5. As noted, *Luis C.* held juveniles in commitment extension hearings have the right under section 1801.5 not to testify, and we presume the Legislature approved this construction when it amended the statute without disturbing *Luis C.*'s interpretation. We discern no reason why the Legislature would choose to treat persons subject to extended commitment under section 1801.5 differently from those subject to extended commitment under section 1026.5.

*Lopez*'s historical rationale for deviating from the statutory language of section 1026.5 is not persuasive. While it is plausible the Legislature amended section 1026.5 in 1979 in response to *Moye*, and intended to conform the procedures for the extension of commitment of individuals acquitted by reason of insanity with commitment procedures for MDSOs, nothing suggests the Legislature intended by the use of similar language in both statutes (patient or person "shall be entitled to the rights guaranteed under the Federal and State Constitutions for criminal proceedings") to limit the rights in either proceeding to the due process-based rights of proof beyond a reasonable doubt and a unanimous verdict.

*Lopez* relied on *Henderson* in determining former section 6316.2 merely codified constitutional protections previously mandated by judicial decision. *Henderson*, in turn, relied on *Burnick* and *Feagley*, but neither case suggested the rights discussed in those cases (proof beyond a reasonable doubt, unanimous verdict, cruel or unusual punishment) should be the only ones available to persons subject to extended commitment. In *Burnick*, the Supreme Court likened the commitment of an MDSO to imprisonment for crime. (*Burnick*, *supra*, 14 Cal.3d at p. 310 ["it is no less cruel to

16

falsely find a man to be a 'mentally disordered sex offender' and confine him indefinitely in a prison-like state mental institution.  Against such grievous errors the law has erected sturdy bulwarks of procedure."].)  Given the backdrop of *Burnick* and *Feagley*, and the Legislature's use of broad language in section 6316.2, it is implausible the Legislature intended to guarantee only those rights expressly at issue in *Burnick* and *Feagley*.

*Lopez*'s reliance on *Bones* is also problematic.  As noted above, *Bones* held Welfare and Institutions Code section 5303 did not grant the potential LPS committee a privilege not to testify.  *Bones* relied on *Burnick*, where the Supreme Court explained why the due process clauses of the California and federal Constitutions required proof beyond a reasonable doubt in MDSO proceedings even though they are viewed as civil matters.  The court stated it was "moved by constitutional considerations of the highest order, inasmuch as we discharge our duty to insure that no person be deprived of his liberty without the due process of law guaranteed by article I, section 7, subdivision (a), of the California Constitution and the Fourteenth Amendment to the United States Constitution." (*Burnick*, *supra*, 14 Cal.3d at p. 314.)  In the footnote mentioned above, *Burnick* noted that while the Legislat ure had not specified the standard of proof for involuntary commitment of persons under the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.), the Legislature had provided in section 5303 that such proceedings must comply with constitutional guarantees of due process and the procedures required under article 1, section 13 of the California Constitution.  The Supreme Court placed the following bracketed insertion after the reference to section 13:  "[now § 7, subd. (a)]." (*Burnick*, *supra*, 14 Cal.3d at p. 314, fn. 5.)

Based solely on this footnote, *Bones* surmised that *Burnick*'s reference to section 7, but not section 15, showed the Supreme Court would interpret section 5303 to merely incorporate due process principles found in section 7 and not the panoply of criminal defense rights found in section 15.  (*Bones, supra,* 189 Cal.App.3d at p. 1016.)  *Lopez* surmised, "The Supreme Court in *Burnick apparently* concluded that, despite the

17

Legislature's reference in Welfare and Institutions Code section 5303 to 'the procedures required under' the part of the constitution containing the right not to testify, the Legislature did not intend that a potential LPS committee" to have that right.  (*Lopez, supra,* 137 Cal.App.4th at p. 1113.)

   *Bones*'s conclusion does not withstand scrutiny.  "It is axiomatic that cases are not authority for propositions not considered."  (*People v. Gilbert* (1969) 1 Cal.3d 475, 482, fn. 7.)  *Burnick* did not decide whether an MDSO was entitled to the right not to testify, nor did it consider whether Welfare and Institutions Code section 5303 also included the rights contained in section 15 after the 1974 constitutional reshuffling of criminal rights.  The issue in *Burnick* concerned whether due process required proof beyond a reasonable doubt in MDSO proceedings.  The footnote in *Burnick* simply pointed out where the due process and burden of proof provisions were currently located in the State Constitution.  Indeed, *Lopez* implicitly recognized *Bones* may have overstated the import of *Burnick* when *Lopez* remarked the Supreme Court had "*apparently* concluded" (italics added) the Legislature's reference in Welfare and Institutions Code section 5303 included only the section 7 criminal rights (*Lopez, supra,* 137 Cal.App.4th at p. 1113).  *Lopez*'s construction of section 1026.5, subdivision (b)(7), proceeds from the unwarranted assumption that *Bones* correctly interpreted *Burnick*.  The conclusion in *Bones* on which *Lopez* relies is weak fodder compared to "the plain, commonsense meaning of the language used by the Legislature."  (*Leiva, supra*, 56 Cal.4th at p. 506.)

   *Lopez* also noted that two years after *Williams* was decided, the Legislature amended section 1026.5 without modifying its language to overrule *Williams* or to state explicitly that an NGI committee has the criminal defendant's privilege not to testify.  (*Lopez, supra,* 137 Cal.App.4th at p. 1115.)  *Williams*, however, involved double jeopardy, not testimonial privileges.  That the Legislature later amended the statute in a manner that had nothing to do with jeopardy or a right not to testify, but rather to overrule the determination in *People v. Gunderson* (1991) 228 Cal.App.3d 1292 that time spent in

18

outpatient status must count towards an MDSO's extended commitment, is of little import here.

In *Joshua D.*, we recognized policy reasons exist both to grant and to deny the right not to testify at commitment extension hearings, but "[w]here the Legislature has made a policy choice, using as here particularly clear and unambiguous language, we may not second-guess its determination." (*Joshua D.*, *supra*, 157 Cal.App.4th at p. 565; see *Murphy, supra*, 378 U.S. at p. 55.) That conclusion applies here with equal force.

III

DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to vacate its order granting the People's motion to compel Hudec to testify at the section 1026.5 hearing and enter a new and different order denying the People's motion.


ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


BEDSWORTH, J.

19