Filed 10/2/14  P. v. Rose CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARC BERNARD ROSE,<br><br>    Defendant and Appellant. | H038704<br>(Santa Clara County<br> Super. Ct. No. 195814) |

Marc Bernard Rose appeals from the August 17, 2012 order for commitment as a sexually violent predator (SVP) under the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.).[1]  Rose raises multiple claims but we find no prejudicial errors.  Accordingly, we will affirm the judgment.

I

*Trial*

At trial in 2012, two psychologists testifying on behalf of the People, Drs. Harry Goldberg and Jack Vognsen, reported that they diagnosed Rose with a current mental disorder of pedophilia with an attraction to prepubescent boys.  As defined by the DSM-IV-TR,[2] a diagnosis of pedophilia requires (1) a person to have recurrent, intense sexually arousing urges, fantasies or behaviors involving prepubescent children,

---

[1]     All further references are to the Welfare and Institutions Code unless otherwise specified.

[2].    We assume the reference was to the Diagnostic and Statistical Manual of Mental Disorders (4th ed.) Text Revisions.

1

generally 13 years of age or younger, (2) the person to have acted upon those sexual urges or the sexual urges to have caused interpersonal difficulty and (3) the person to be at least 16 years of age and five years older than the children. A person may be diagnosed as a pedophile even if the person had some adult partners. Dr. Goldberg indicated that Rose's pedophilia was the nonexclusive type. Pedophilia is a chronic, lifelong disorder for which there is no cure.

Rose, who had married a woman in 1986, came to the attention of law enforcement because he was soliciting pornography of prepubescent children in 1987. The police discovered Rose had sexually molested Jaime 20 to 30 times while Jaime was between the ages of 11 and 14. Rose had met Jaime when Jaime was visiting his brother who lived in the apartment building where Rose lived. Rose photographed Jaime when he was 11 years old and again when Jaime was 14 years old. Rose shared photographs of Jaime with others. When Jaime was 15 or 16 years old, after Jaime's parents had committed suicide, Jaime briefly lived with Rose, during which time Rose engaged in an act of oral copulation and sodomy with him. In 1987, Rose told a sergeant that he was sexually interested in children and he had fantasies about them.

Rose was convicted of one count of lewd conduct with a child, one count of oral copulation with a child, and one count of using obscene material with a child. He was sentenced to a prison term of three years eight months. Rose was released on parole sometime around 1990 and he received treatment through parole.

In 1992, while living with his wife, Rose was discovered to be in possession of child pornography, including pictures of children clothed and unclothed, two video tapes showing sexual acts between children, a picture of his prior victim, a movie of a young adolescent masturbating, and an album of pictures of Perry, a nine-year-old boy. Rose had met Perry while Perry was visiting his grandmother at the apartment complex where Rose lived. Perry eventually disclosed that Rose had touched him on his genitals while Perry was nude and Rose had taken pictures of Perry in the nude.

2

In preparation for sentencing after conviction, Rose admitted to the probation officer that he had showed his penis to Perry and touched Perry's penis multiple times over several weeks. Rose blamed Perry for pestering him to watch dirty movies.

While in prison, Rose was found in possession of photographs of nude adult females and received an "institutional violation." After his release from prison, Rose was sent to Atascadero State Hospital. Rose was found with drawings he had made of a young man in a sexually aroused state. Rose did not see anything wrong with it. On May 27, 1999, Rose received pictures of clothed adult and child television actors, which he had ordered in the mail. On June 2, 1999, Rose was found with five books containing sexually provocative images of children. In August 27, 1999, Rose was found with material containing sadomasochistic images. On about March 13, 2001, Rose was found with magazines containing nude pictures of children.

In January 2006, Rose was transferred to Coalinga State Hospital. Rose declined treatment there from January 2006 to October 2009. He subsequently began phased treatment. At the time of trial, Rose was in phase two of five phases of treatment at Coalinga State Hospital and he had not yet taken the test to graduate to phase three. Treatment is aimed at the person's management of their urges and behaviors. Research indicates that pedophiles who complete treatment have lower recidivism rates.

In the opinion of Drs. Goldberg and Vognsen, Rose's pedophilia caused him to have volitional and emotional impairment and predisposed him to commit sexual acts. Rose had groomed both Jaime and Perry for sexual molestation. Rose had sexually offended with Perry while on parole and in treatment. Rose admitted to having three to five male victims during his life and molesting each of them 11 to 20 times. In 1997, Rose admitted to Dr. Goldberg that he previously had urges toward and fantasies about children. Rose had been found with pornographic materials on three occasions during his stay at Atascadero State Hospital. Rose had a long history of collecting and soliciting child pornographic material, which Dr. Goldberg testified was one of the risk factors for

3

reoffense. Although Rose had not committed child molestation since molesting Perry, he had been in prison or a hospital since that time.

Both Dr. Goldberg and Dr. Vognsen administered several actuarial risk assessment instruments. Both gave Rose a score of four on the static 99-R and a seven on Static 2002-R. Those scores placed Rose in the "moderate-high risk category." Dr. Goldberg estimated that Rose's overall risk of being detected for a new offense after 10 years was "somewhere between 29 and 39 percent." Dr. Vognsen indicated that Rose had an approximately 30 to 40 percent chance of being caught for committing or convicted of a sexual reoffense over a 10-year period. In Dr. Goldberg's opinion, there was a well-founded and serious risk that Rose would reoffend in a predatory manner. Dr. Vognsen concluded that Rose was likely to reoffend in a predatory manner

Dr. Goldberg acknowledged that when Rose was 59.9 years old, his score on the Static 99-R would drop to one due to his age. That would be one factor that he would consider if he assessed Rose's risk at that time. Dr. Vognsen acknowledged that, in general, the risk of reoffending drops significantly at the age of 60.

The People called Rose as a witness. Rose testified that he had recently turned 54 years old. He admitted that he was still a pedophile, but he asserted that he was in remission and maintaining his abstinence. Rose admitted that he still had pedophiliac urges but he claimed that he could control them and he was going to try to avoid children. Rose described his sexual molesting and photographing of Jaime and Perry.

Two defense experts, Drs. Raymond Anderson and James Park, both licensed psychologists, testified that Rose did not meet the criteria for a current diagnosis of pedophilia. Dr. Anderson believed that Rose's fantasies were not sufficiently intense and persistent to meet the diagnosis criteria. In addition, it was unusual for a pedophile to be married or have sex with adults. Dr. Anderson conceded that Rose had been collecting child pornography since before 1980. Dr. Anderson acknowledged that Rose had

4

admitted he had sexual fantasies or urges involving children, he was sexually attracted to children, and he was sexually aroused by some children and child pornography.

Dr. Park had previously diagnosed Rose with pedophilia, sexually attracted to males, nonexclusive type, in remission. Dr. Park no longer gave Rose that diagnosis. Dr. Park's current opinion was based partially on the fact that Rose's sexual interest in children was not exclusive and he could respond sexually to adults but Dr. Park acknowledged that there was an nonexclusive type of pedophilia. Rose had admitted to Dr. Park that he had been sexually interested in and attracted to his victims.

Dr. Carvajal testified on behalf of the defense. He worked at Coalinga State Hospital as a unit psychologist and as a group therapist. Rose had been part of a treatment group facilitated by Dr. Carvajal. Rose had acknowledged that he had a problem and he needed to learn how to manage it. In Dr. Carvajal's opinion, Rose had done very well in treatment during the approximately 16 months that Carvajal had been his facilitator. Rose had admitted his disorder, he had been open to treatment, he had finished assignments, and he had shown empathy for past victims. Dr. Carvajal indicated that there is not a curative treatment for pedophilia. Rather, treatment is aimed at managing the disorder.

## II

### *Discussion*

#### A. *Alleged Trial Error*

#### 1. *Instruction Regarding an "Admission"*

Rose's counsel objected to the proposed jury instruction defining "admission." While counsel acknowledged that Rose had admitted in testimony that he was a pedophile, counsel was concerned that the instruction improperly suggested that his admission proved the SVP petition. Counsel contended that the instruction made the requirement of a currently diagnosed mental disorder seem more important than the requisite likelihood of reoffense.

5

The trial court gave an instruction, modeled on CALJIC No. 2.71, which directed the jury to view with caution any unrecorded, out-of-court statement made by Rose. The jury was instructed: "An admission is a statement made by the respondent which does not by itself acknowledge the truth of the petition for which the respondent is on trial, but which statement tends to prove the truth of the petition when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the respondent made an admission, and if so, whether that statement is true in whole or in part. [¶] Evidence of an oral admission of the respondent not contained in an audio or video recording and not made in court should be viewed with caution."

Rose argues that this instruction impermissibly lowered the prosecution's burden of proof in violation of his rights to due process and a fair trial.[3] The challenged instruction made clear that an admission did not in itself prove the petition. It reminded jurors that they were the exclusive judges of the truth of any part of any statement made by Rose. The cautionary part of the instruction was to Rose's benefit. The instruction did not directly or indirectly address the burden of proof or relieve the People of its burden of proof. In other instructions, the jury was fully instructed regarding the meaning of "sexually violent predator" and the People's burden of proving beyond a reasonable doubt that Rose was an SVP. The jurors were told to "[c]onsider the instructions as a whole and each in light of all the others." The challenged instruction did not lower the People's burden of proof.

2. *Refusal to Give Requested Instruction as to Likelihood of Reoffense*

In a written in limine motion, the defense requested an instruction regarding the meaning of "likely," which term is used in the definition of an SVP. The proposed

---

[3] To the extent that Rose is also attacking the prosecutor's closing argument related to Rose's admission that he is a pedophile, those claims were forfeited by failing to timely and specifically object below. (See *People v. Shazier* (2014) 60 Cal.4th 109,145; *People v. Clark* (2011) 52 Cal.4th 856, 960.)

instruction read: "The word 'likely' as used in this definition means the person presents a substantial danger, that is, a serious and well-founded risk that he will commit sexually violent predatory crimes if free in the community. It does not mean that it must be more probable than not that there will be an instance of reoffending. However, you may not find the respondent to be a sexually violent predator unless you find that the respondent does in fact present a high risk of reoffense." (Emphasis omitted.) When it addressed the request, the trial court stated the issue would be revisited if necessary when the court and the parties discussed the jury instructions.

The trial court instructed the jury regarding the definition of an SVP, including element three, namely that a currently diagnosed mental disorder "makes [defendant] a danger to the health and safety of others in that it is *likely* that he will engage in sexually violent predatory criminal behavior unless confined within a secure facility." (Italics added.) The court also gave the following definition: "The word 'likely' as used in this definition means the person presents a substantial danger, that is, a serious and well-founded risk that he will commit sexually violent predatory crimes if free in the community. *The term 'likely' as used in this definition means much more than a mere possibility, but it does not mean 'more likely than not.' In other words, the likelihood that the person will engage in such conduct does not have to be greater than 50 percent.*" (Italics added.) The italicized portion of the instruction differs from the language requested by Rose.

Rose now claims that the trial court erred by not giving the requested instruction, pointing to language in *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888 (*Ghilotti*). The People assert that *Ghilotti*'s definition of "likely" did not require the trier of fact to find a "high risk" of reoffense.[4]

---

[4] Although the People have not raised the forfeiture rule, it appears that Rose forfeited any claim of error by failing to renew, on the record, his request for the (continued)

7

In *Ghilotti*, the California Supreme Court considered the standard set forth in section 6600, subdivision (d). (*Ghilotti*, *supra*, 27 Cal.4th at pp. 915-923.) Under that provision, two mental health professionals must concur that the " 'person has a diagnosed mental disorder so that he or she is *likely* to engage in acts of sexual violence *without appropriate treatment and custody*' " before an SVP petition can be filed. (§ 6600, subd. (d), italics added.) The California Supreme Court stated: "[T]he word 'likely," when used in this context, must be given a meaning consistent with the statute's clear overall purpose. That purpose is to protect the public from that limited group of persons who were previously convicted and imprisoned for violent sex offenses, and whose terms of incarceration have ended, but whose current mental disorders so impair their ability to control their violent sexual impulses that they *do in fact* present a high risk of reoffense if they are not treated in a confined setting." (*Ghilotti*, *supra*, at p. 921.) This is the language relied upon by Rose.

But the Supreme Court ultimately held: "[T]he phrase '*likely* to engage in acts of sexual violence' (italics added), as used in section 6601, subdivision (d), connotes much more than the mere *possibility* that the person will reoffend as a result of a predisposing mental disorder that seriously impairs volitional control. On the other hand, the statute does not require a precise determination that the chance of reoffense is *better than even*. Instead, an evaluator applying this standard must conclude that the person is 'likely' to reoffend if, because of a current mental disorder which makes it difficult or impossible to restrain violent sexual behavior, the person presents a *substantial danger*, that is, a *serious and well-founded risk*, that he or she will commit such crimes if free in the community." (*Ghilotti*, *supra*, 27 Cal.4th at p. 922.)

---

proposed instruction when the parties went over the instructions with the court. (See *People v. Davis* (2009) 46 Cal.4th 539, 616-617.)

8

The Supreme Court also rejected in *Ghilotti* the argument that "constitutional principles of substantive due process, as applicable to involuntary civil commitment statutes, require a limitation of such commitments to persons who are 'highly likely' to reoffend." (*Ghilotti*, *supra*, 27 Cal.4th at p. 923.) The court was unpersuaded that "a valid involuntary commitment law requires proof that the person is *more likely than not* to reoffend." (*Ibid.*) It determined that "the state has a compelling protective interest in the confinement and treatment of persons who have already been convicted of violent sex offenses, and who, as the result of current mental disorders that make it difficult or impossible to control their violent sexual impulses, represent a *substantial danger* of committing similar new crimes [citations], even if that risk cannot be assessed at greater than 50 percent." (*Id.* at p. 924.)

In *People v. Roberge* (2003) 29 Cal.4th 979, the Supreme Court addressed statutory definition of a sexually violent predator (§ 6600, subd. (a)), which applies at trial. (*People v. Roberge*, *supra*, at p. 982.) The Supreme Court held that "the phrase 'likely [to] engage in sexually violent behavior' in section 6600, subdivision (a), should be given the same meaning as the phrase 'likely to engage in acts of sexual violence without appropriate treatment and custody' in section 6601, subdivision (d), the provision at issue in *Ghilotti*." (*Id.* at p. 987.)

Rose's proposed instruction was likely to confuse and mislead the jury regarding the meaning of "likely" as used in the definition of "sexually violent predator." On the other hand, the trial court's instruction adequately and accurately defined the term "likely." A trial court may properly refuse a special instruction offered to highlight a defense theory "if it incorrectly states the law, is argumentative, duplicative, or potentially confusing (*People v. Gurule* (2002) 28 Cal.4th 557, 659) . . . ." (*People v. Moon* (2005) 37 Cal.4th 1, 30.) The court did not err in refusing to give the defendant's proposed instruction.

9

3. *Repeated Use of Phrase "Sexually Violent Predator"*

The trial court denied Rose's written in limine motion to prohibit the use of the phrases "sexually violent predator" or "Sexually Violent Predator Act," which he argued were unnecessarily inflammatory. During trial, Rose unsuccessfully objected to the use of "sexually violent predator" in the jury instructions and asked the court to use the abbreviation "SVP."

Rose now claims that the phrase "sexually violent predator" is a "highly inflammatory epithet" and the repeated use of that phrase before the jury was "grossly prejudicial" and a violation of his rights to due process and a fair trial. "It is, of course, improper to make arguments to the jury that give it the impression that 'emotion may reign over reason,' and to present 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response.' [Citation.]" (*People v. Padilla* (1995) 11 Cal.4th 891, 956-957, overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) The phrases "sexually violent predator" and "Sexually Violent Predator Act" did not constitute, however, inflammatory rhetoric that diverted the jury's attention from its proper role or invited an irrational response.

The trial's purpose was to determine whether or not Rose was a "sexually violent predator" under the proper legal standard. From the outset, the trial court made clear that Rose was presumed not to be an SVP unless the People presented proof beyond a reasonable doubt.[5] The jury received the legal definition of "sexually violent predator."

---

[5]     During voir dire of the jury, the court instructed: "I want you to presume that for the purposes of this voir dire that as Mr. Rose sits here he is not a sexually violent predator. He is to be clothed with his presumption that the petition is not true. This presumption stays with him through the taking of testimony and other evidence presented, the arguments of counsel, the jury instructions given by me, indeed, it goes with the jury into the jury deliberation room. It applies unless all 12 jurors unanimously find that the People have met their burden of proof beyond a reasonable doubt and dispel (continued)

In its final instructions, the court again instructed the jury that the People had the burden of proving beyond a reasonable doubt that Rose is a "sexually violent predator." The court directed the jurors to find the allegation untrue, if after considering all the evidence, they had a reasonable doubt that Rose was a sexually violent predator. There has been no showing that the use of the phrases "sexually violent predator" or "Sexually Violent Predator Act" at trial inflamed the jurors' emotions and caused undue prejudice against Rose. The use of those phrases did not deprive Rose of a fundamentally fair trial or due process.

4. *Compulsory Testimony*

Rose brought a motion in limine to establish that he had the right, on equal protection grounds, to not be compelled to testify for the People. He cited *In re Luis* (2004) 116 Cal.App.4th 1397 (*Luis*). The trial court denied the motion. The People called Rose to testify.

Rose now argues that his right to equal protection was violated. He cites *People v. Haynie* (2004) 116 Cal.App.4th 1224 (*Haynie*) as well as *Luis*, *supra*, 116 Cal.App.4th 1397.

In *Haynie*, the Fifth District concluded that a person who was committed after being found not guilty by reason of insanity (NGI) and who is the subject of a petition to extend a commitment under Penal Code section 1026.5, subdivision (b), has the right under that section's subdivision (b)(7) to refuse to testify at the extended commitment trial.[6] (*Haynie*, *supra*, 116 Cal.App.4th at p. 1228, but see *People v. Superior Court*

the presumption that the petition is not true. [¶] The mere fact of the petition alleging such a phrase as sexually violent predator will no doubt elicit a visceral reaction in you. It is an accusation. It is not the truth. It is a petition. You're going to decide whether it's true or not. . . . The jury is going to objectively decide whether or not the People proved those elements beyond a reasonable doubt."

[6] Penal Code section 1026.5, subdivision (b)(7), provides in pertinent part: "The person shall be entitled to the rights guaranteed under the federal and State Constitutions (continued)

11

(*Williams*) (1991) 233 Cal.App.3d 477, 488.) In *Luis*, the Fifth District concluded a potential committee under the extended detention scheme for dangerous youthful offenders set forth in section 1800 et seq. has the right under section 1801.5 to refuse to testify at the extended commitment trial.[7] (*Luis*, *supra*, 116 Cal.App.4th at p. 1403; accord *Joshua D. v. Superior Court* (2007) 157 Cal.App.4th 549, 558, 565; but see *People v. Lopez* (2006) 137 Cal.App.4th 1099, 1116; but cf. *Conservatorship of Bones* (1987) 189 Cal.App.3d 1010, 1015-1017 [§ 5303]; *People v. Henderson* (1981) 117 Cal.App.3d 740, 748 [former § 6316.2, subd. (e)].) The SVPA contains no provision, analogous to those considered in *Haynie* and *Luis*, granting an alleged SVP the constitutional rights guaranteed in criminal proceedings.

"[E]qual protection principles are often invoked in civil commitment cases to ensure that the statutory scheme applicable to a particular class of persons has not treated them unfairly in comparison with other groups with similar characteristics. [Citation.]" (*People v. Barrett* (2012) 54 Cal.4th 1081, 1107.) "[E]qual protection safeguards against the arbitrary denial of benefits to a certain defined class of individuals . . . ." (*People v. McKee* (2010) 47 Cal.4th 1172, 1207 (*McKee I*).) "[W]hen certain due process protections for those civilly committed are guaranteed by statute, even if not constitutionally required, the denial of those protections to one group must be reasonably justified in order to pass muster under the equal protection clause." (*Ibid.*)

for criminal proceedings." *Hudec v. Superior Court*, S213003 (pet. review granted Oct. 2, 2013) is pending before the California Supreme Court. That case presents the following issue on review: "Does Penal Code section 1026.5, subdivision (b)(7), give a person who was committed after being found not guilty of criminal charges by reason of insanity the right to refuse to testify in a proceeding to extend that civil commitment?" (California Supreme Court http://appellatecases.courtinfo.ca.gov/search/case/mainCaseScreen.cfm?dist=0&doc_id=2054905&doc_no=S213003 [as of Aug. 27, 2014].)

[7]     Section 1801.5 provides in part: "The person shall be entitled to all rights guaranteed under the federal and state constitutions in criminal proceedings."

" ' "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." ' (*Cooley v. Superior Court* (2002) 29 Cal.4th [228,] 253.) In other words, we ask at the threshold whether two classes that are different in some respects are sufficiently similar with respect to the laws in question to require the government to justify its differential treatment of these classes under those laws." (*McKee I*, *supra*, 47 Cal.4th at p. 1202.) "Where two or more groups are properly distinguishable for purposes of the challenged law, it is immaterial if they are indistinguishable in other respects. (*Cooley*, *supra*, at p. 253.)" (*People v. Barrett*, *supra*, 54 Cal.4th at p. 1107.)

The California Supreme Court determined in *McKee I* that SVP's and NGI's are similarly situated with respect to an equal protection claim focusing on differences in the duration of commitment. (*McKee I*, *supra*, 47 Cal.4th at p. 1207; see *id.* at p. 1203 [mentally disordered offenders (MDO's) and SVP's also similarly situated for "present purposes"].) The court's reasoning is applicable to Rose's present equal protection claim.

Dangerous youthful offenders whose detentions are extended under section 1800 et seq. and SVP's are not similarly situated for all purposes. (Compare *In re Lemanuel C.* (2007) 41 Cal.4th 33, 47-49 with *In re Howard N.* (2005) 35 Cal.4th 117, 131, 135.) With respect to a statutorily provided privilege against self-incrimination, however, the People have not identified any principled basis for concluding that SVP's and dangerous youthful offenders are not similarly situated. The same policy considerations appear to be equally applicable to both groups. (See *Joshua D. v. Superior Court*, *supra*, 157 Cal.App.4th at p. 565; cf. *Malloy v. Hogan* (1964) 378 U.S. 1, 8.) As the California Supreme Court has recognized, potential committees under civil commitment schemes

13

have the same interest at stake, namely "the loss of liberty through involuntary civil commitment." (*McKee I*, *supra*, 47 Cal.4th at p. 1204.)

We conclude that SVP's are similarly situated with respect to both NGI's and dangerous youthful offenders for purposes of a statutory privilege of not testifying in the People's case at a commitment trial.[8] We assume, for purposes of this appeal, that both the latter groups are statutorily entitled to that right since a contrary conclusion would be at odds with the broad statutory language of those commitment schemes, which appears to incorporate at least the trial rights of criminal defendants. (See Pen. Code, § 1026.5, subd. (b)(7); § 1801.5; *Luis*, *supra*, 116 Cal.App.4th at p. 1403; *Haynie*, *supra*, 116 Cal.App.4th at p. 1228; see also *In re D.B.* (2014) 58 Cal.4th 941, 945-946.) Since the People have not satisfied the strict scrutiny standard of review (see *McKee I*, *supra*, 47 Cal.4th at pp. 1197-1198, 1208-1209), we assume the trial court should have likewise afforded Rose such statutory privilege.

We nevertheless conclude that the remedy is not reversal. "When a court concludes that a statutory classification violates the constitutional guarantee of equal protection of the laws, it has a choice of remedies. (See *Califano v. Westcott* (1979) 443 U.S. 76, 89-91 [61 L. Ed. 2d 382, 99 S.Ct. 2655] [court may either withdraw benefits of welfare statute from favored class or extend those benefits to excluded class]; *Heckler v. Mathews* (1984) 465 U.S. 728, 740 [79 L. Ed. 2d 646, 104 S.Ct. 1387] [same]; *People v. Liberta* (1984) 64 N.Y.2d 152 [474 N.E.2d 567, 578, 485 N.Y.S.2d 207] [court can either invalidate rape statute or expand it to include spousal rape].)" (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1207.) "In choosing the proper remedy for an equal protection

---

[8]     Of course, under the self-incrimination clause of the Fifth Amendment, which applies to the states through the Fourteenth Amendment (*Malloy v. Hogan*, *supra*, 378 U.S. at p. 6), a person has the constitutional right, in any proceeding, not to answer official questions that might incriminate him in future criminal proceedings. (See *Allen v. Illinois* (1986) 478 U.S. 364, 368.)

14

violation, [the courts'] primary concern is to ascertain, as best we can, which alternative the Legislature would prefer. [Citations.]" (*Id*. at pp. 1207-1208.)

Rose had no independent due process right to refuse to testify at his SVP trial. (See *Allen v. Illinois*, *supra*, 478 U.S. at p. 375; *People v. Leonard* (2000) 78 Cal.App.4th 776, 792-793; see also *Cramer v. Tyars* (1979) 23 Cal.3d 131, 137-138.) The constitutional right invoked by Rose is *equal treatment*. Assuming the trial court should have extended to Rose a statutory privilege against testifying at his SVP trial under equal protection principles, the *Watson* standard of review is applicable to the denial of that right as would be the case for other potential committees expressly afforded that statutory right but erroneously denied it. (See *People v. Barrett*, *supra*, 54 Cal.4th at p. 1151 (conc. & dis. opn. of Liu, J.); *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); cf. *People v. Epps* (2001) 25 Cal.4th 19, 28-29 [*Watson* test applied to denial of statutory right to jury trial].)

Under the *Watson* standard of review, "a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 834; see Cal. Const., art. VI, § 13 ["No judgment shall be set aside . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"].) The Watson test is "based upon reasonable probabilities rather than upon mere possibilities." (*Watson*, *supra*, p. 837.)

In this case, Rose has not established that there is a reasonable probability that a result more favorable to him would have been reached if he had not been compelled to testify. The evidence showed that he had been convicted of offenses related to sexually molesting two boys. He admitted to having three to five victims, all of whom he molested multiple times. Despite the penal consequences of sexual offending, he had

15

reoffended with Perry. He had groomed both identified victims. Rose had a long history of collecting and soliciting child pornography, which was a risk factor for reoffense. Despite being confined in Atascadero State Hospital, Rose still possessed pornographic materials on several occasions. The People's experts concurred that Rose had a pedophilia disorder, which could not be cured, and he was an SVP. The testimony of Drs. Anderson and Park was not strong. Both failed to accept the nonexclusive type of pedophilia. Dr. Park had previously diagnosed Rose with having pedophilia, nonexclusive type, in remission. Rose had admitted having sexual fantasies or urges involving children to Dr. Anderson and he had expressed his sexual attraction to children or the victims to both psychologists. While Dr. Carvajal believed that Rose had done very well in early treatment, Dr. Carvajal agreed that pedophilia had no cure. At the time of trial, Rose had not yet completed phase two of the five phases of treatment, which was focused on learning to manage the disorder.

5. *No Reversal for Cumulative Errors*

Rose maintains that the judgment must be reversed due to the cumulative effect of multiple errors. Since we have not found multiple errors, this argument is without merit.

B. *Constitutional Challenges to Indeterminate Term of Commitment*

1. *Indeterminate Term does not Violate Equal Protection*

Rose asserts that the indeterminate commitment under the SVPA violates equal protection because persons who are civilly committed under other laws have limited terms of commitment and the burden is on the government to justify extending a commitment. On appeal, he focuses on the reasons this court should reject *People v. McKee* (2012) 207 Cal.App.4th 1325 (*McKee II*).

a. *McKee I and McKee II*

In *McKee I*, *supra*, 47 Cal.4th 1172, the California Supreme Court recognized that persons civilly committed as MDO's or NGI's are subject to short, definite terms of commitment whereas persons found to be SVP's are committed to an indeterminate term

16

of commitment. (*Id*. at pp. 1202, 1207.) The court concluded that SVP's were similarly situated to these other groups of committees. (*Id*. at pp. 1204, 1207.) It remanded the matter to the trial court "to determine whether the People . . . can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment." (*Id*. at pp. 1208-1209, fn. omitted.) The trial court resolved this question in favor of the People on remand and its order was affirmed on appeal in *McKee II*. (*McKee II*, *supra*, 207 Cal.App. 4th at p. 1350.) The Supreme Court denied review of *McKee II* ( review den. Oct. 10, 2012, S204503).

b. *Challenges to McKee II*

Rose first challenges the application of the *McKee II* decision to his own case. He claims he is entitled to challenge the constitutionality of the SVPA's indeterminate commitment scheme on equal protection grounds and have an evidentiary hearing on the issue. He argues that *McKee II* binds only defendant McKee and does not constitute binding authority under the doctrine of collateral estoppel.

The People do not assert that the collateral estoppel doctrine applies here and are not suggesting that Rose is the same party as, or in privity with, defendant McKee, which is a requirement for applying the doctrine. (See *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341.) While we acknowledge that an appellate opinion does not ordinarily bind another court of appeal (see *Auto Equity Sales*, *Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455), it can serve as persuasive authority. (See *Bradley v. Gilbert* (2009) 172 Cal.App.4th 1058, 1070.)

The California Supreme Court clearly intended to avoid an unnecessary multiplicity of proceedings when it remanded the matter in *McKee I*. (See *People v. Kisling* (2014) 223 Cal.App.4th 544, 548, review den. Apr. 23, 2014, S216859.) Its remand was to allow the government an opportunity to "demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and

17

NGI's in order to obtain release from commitment." (*McKee I*, *supra*, 47 Cal.4th at pp. 1208-1209, fn. omitted.)  The court stated "[i]t must be shown that notwithstanding the similarities between SVP's and MDO's, the former as a *class* bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society." (*Id*. at p. 1208, italics added.)  It explained that this showing could be made "in a variety of ways," including demonstrating that the "inherent nature of the SVP's mental disorder makes recidivism *as a class* significantly more likely." (*Ibid*., italics added.)  "The Supreme Court's emphasis on classwide proof, together with its suspension of activity in grant-and-hold cases to avoid an unnecessary multiplicity of proceedings, demonstrates to us the Supreme Court intended the equal protection challenge to the Amended SVPA be resolved on a classwide basis in a single case." (*People v. McDonald* (2013) 214 Cal.App.4th 1367, 1378, review den. Jul. 10, 2013, S210418.)  The constitutional inquiry in *McKee II* was not dependent upon the circumstances or characteristics of an individual person found to be an SVP.

Rose next maintains that *McKee II* incorrectly reviewed the equal protection claim by (1) using a deferential rather than an independent standard of review, (2) applying the rational basis test rather than the strict scrutiny test, (3) considering evidence not actually considered by the electorate in enacting Proposition 83, (4) not requiring the SVPA to be narrowly tailored, and (5) failing to address or distinguish *In re Calhoun* (2004) 121 Cal.App.4th 1315.  We reject each of these claims.

"The Court of Appeal in *McKee II* applied the correct standard of review.  The court stated, '[a]lthough the trial court heard the testimony of many witnesses and received in evidence many exhibits, the instant constitutional question involved mixed questions of law and fact that are predominantly legal, if not purely legal questions, which are subject to de novo review.' (*McKee II*, *supra*, 207 Cal.App.4th at p. 1338.)  The court then explained that its independent review of the evidence required it to

18

determine 'whether the People presented substantial evidence to support a reasonable inference or perception that the [SVPA]'s disparate treatment of SVP's is necessary to further compelling state interests.' (*Id*. at p. 1339.) That standard is consistent with the applicable standard of review the Supreme Court articulated in *McKee I*: 'When a constitutional right, such as the right to liberty from involuntary confinement, is at stake, the usual judicial deference to legislative findings gives way to an exercise of independent judgment of the facts to ascertain whether the legislative body " 'has drawn reasonable inferences based on substantial evidence.' " ' (*McKee I*, *supra*, 47 Cal.4th at p. 1206.)" (*People v. McDonald*, *supra*, 214 Cal.App.4th at p. 1379.)

Rose nevertheless asserts that the appellate court in *McKee II* did not apply a de novo standard, pointing to the opinion's references to "substantial evidence." *McKee II* concluded "the trial court correctly found the People presented substantial evidence to support a reasonable perception by the electorate that SVP's present a substantially greater danger to society than do MDO's or NGI's, and therefore the disparate treatment of SVP's under the Act is necessary to further the People's compelling interests of public safety and humane treatment of the mentally disordered." (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1330-1331.) Nothing in *McKee II* suggests that the appellate court used the word "substantial" to refer to the substantial evidence test rather than to constitutional sufficiency of the evidence. The court understood that the burden was on the government to present sufficient evidence to satisfy the strict scrutiny standard. (See *id*. at pp. 1335, 1338, fn. 3.)

Rose insists that the reviewing court in *McKee II* applied the rational basis test. Reasonable speculation establishing the rationality of a legislative classification, unsupported by evidence or empirical data in the record, meets the rational basis test. (See *Heller v. Doe by Doe* (1993) 509 U.S. 312, 319-321.) The court clearly understood the strict scrutiny test applied and it required the government to present evidence showing "both a compelling state interest justifying the disparate treatment *and* that the disparate

19

treatment is necessary to further that compelling state interest. [Citations.]" (*McKee II*, *supra*, 207 Cal.App.4th at p. 1349.)

Citing a number of United States Supreme Court cases, Rose argues that the appellate court in *McKee II* improperly considered evidence not before the electorate that approved Proposition 83. The cases cited by Rose stand for the principle that an after-the-fact rationalization for a challenged classification does not satisfy the strict scrutiny standard of review. (See, e.g., *U.S. v. Virginia* (1996) 518 U.S. 515, 533 [a state's justification for a challenged gender classification "must be genuine, not hypothesized or invented *post hoc* in response to litigation"], 535-536 ["a tenable justification" for gender classification "must describe actual state purposes, not rationalizations for actions in fact differently grounded"]; *Shaw v. Hunt* (1996) 517 U.S. 899, 908, fn. 4 ["[A] racial classification cannot withstand strict scrutiny based upon speculation about what 'may have motivated' the legislature. To be a compelling interest, the State must show that the alleged objective was the legislature's 'actual purpose' for the discriminatory classification [citation], and the legislature must have had a strong basis in evidence to support that justification before it implements the classification."].)

We do not think *McKee I* departs from that principle. The higher recidivism rate of sex offenders was a central concern declared in Proposition 83 itself, which was set forth in the official voter's guide. (Official Voter's Information Guide, Gen. Elec. (Nov. 7, 2006), text of Prop. 83, § 2, subd. (b), p. 127.) The Supreme Court determined that Proposition 83's "legislative findings recited in the ballot initiative do not by themselves justify the differential treatment of SVP's." (*McKee I*, *supra*, 47 Cal.4th at p. 1207.) "When a constitutional right, such as the right to liberty from involuntary confinement, is at stake, the usual judicial deference to legislative findings gives way to an exercise of independent judgment of the facts to ascertain whether the legislative body 'has drawn reasonable inferences based on substantial evidence.' [Citations.]" (*Id*. at p. 1206.)

20

Since "the government ha[d] not yet shown that the special treatment of SVP's is validly based on the degree of danger reasonably perceived as to that group, nor whether it arises from any medical or scientific evidence" (*id*. at p. 1210), *McKee I* gave the People "an opportunity to make the appropriate showing on remand." (*Id*. at p. 1208; see *id*. at p. 1210 ["legislative distinctions in classes of persons subject to civil commitment" must be "factually based"].) We are, of course, bound by the California Supreme Court's decision. (*Auto Equity Sales*, *Inc. v. Superior Court*, *supra*, 57 Cal.2d at p. 455.)

Rose also contends that the *McKee II*'s equal protection analysis was flawed because it did not evaluate whether the challenged provisions of the SVPA were narrowly tailored. (See *McKee II*, *supra*, 207 Cal.App.4th at pp. 1348-1349.) We agree that the strict scrutiny test is not satisfied if there is an *equally efficacious* but less constitutionally burdensome means (i.e., less restrictive alternative) of accomplishing a compelling state interest. (See, e.g., *Citizens United v. FEC* (2010) 558 U.S. 310, 340; *Zablocki v. Redhail* (1978) 434 U.S. 374, 388-389 ; *Dunn v. Blumstein* (1972) 405 U.S. 330, 342-342.) However, as stated, the *McKee II* court understood that the strict scrutiny test required the government to "show both a compelling state interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest. [Citations.]" (*McKee II*, *supra*, at p. 1349.) Given the evidence produced in *McKee II* by the People that many SVP's do not participate in treatment and paraphilia disorders are pervasive, persist for a lifetime, and are not treatable with medication (*id*. at pp. 1345-1346), it appears *McKee II* reached the correct result. Rose has not suggested any less drastic means of protecting the compelling state interests at stake. Narrow tailoring to serve a compelling state interest does not require exhaustion of every conceivable alternative. (See *Grutter v. Bollinger* (2003) 539 U.S. 306, 339.)

Rose also complains that *McKee II* failed to address or distinguish *In re Calhoun* (2004) 121 Cal.App.4th 1315 (*Calhoun*). *Calhoun* found that "[f]or purposes of the law concerning the right to refuse antipsychotic medication, MDO's and SVP's are similarly

21

situated." (*Id*. at p. 1351; see *McKee I*, *supra*, 47 Cal.4th at p. 1203 [citing *Calhoun* to support conclusion SVP's and MDO's are similarly situated].) *Calhoun* held that, under equal protection principles, SVP's had the same right as MDO's to refuse antipsychotic medication. (*Calhoun*, *supra*, at pp. 1322, 1350-1354.)

*Calhoun* focused on whether there were any differences between SVP's and MDO's regarding the need for and effectiveness of antipsychotic medication and it found the government "failed to demonstrate a compelling state interest that justifies the distinction between MDO's and SVP's concerning the [committee's] right to refuse antipsychotic medication." (*Calhoun*, *supra*, 121 Cal.App.4th at pp. 1353-1354.) In contrast, *McKee II* found significant differences in SVP's and MDO's recidivism rates, dangerousness, and diagnosis and treatment. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1340-1347.) *Calhoun* does not, as Rose claims, reveal a defect in *McKee II*'s logic. As Justice Chin has observed, "[t] he exact criteria for medicating mentally disordered offenders is an entirely different matter from the procedures adopted for releasing them into society." (*McKee I*, *supra*, 47 Cal.4th at p. 1220, fn. 4 (conc. & dis. opn. of Chin, J.).)

We find the equal protection arguments advanced in this appeal are without merit and do not require a remand for a further evidentiary hearing.

2. *Indeterminate Commitment Does Not Violate Due Process*

Rose argues that the indeterminate term of commitment violates due process. He acknowledges, however, that *McKee I* rejected a due process challenge to the SVPA. (See *McKee I*, *supra*, 47 Cal.4th at pp. 1188-1193.) In reaching that conclusion, the California Supreme Court partially relied on *Jones v. United States* (1983) 463 U.S. 354, an NGI case. (See *McKee I*, *supra*, at p. 1191.) The court stated in part: "Although McKee was not found not guilty by reason of insanity, he has been found beyond a reasonable doubt in his initial commitment to meet the definition of an SVP. That finding is, for present constitutional purposes, the functional equivalent of the NGI

22

acquittal in *Jones*." (*Ibid*.) It concluded that "as in *Jones*, the requirement that McKee, after his initial commitment, must prove by a preponderance of the evidence that he is no longer an SVP does not violate due process." (*Ibid*.) Rose insists that his case is different from *McKee I* because the evidence suggests that his actuarial prediction of future recidivism will soon be reduced to zero and, therefore, his commitment is not the functional equivalent of an NGI commitment.

In *McKee I*, the Supreme Court determined with respect to the due process challenge: "After Proposition 83, it is still the case that an individual may not be held in civil commitment when he or she no longer meets the requisites of such commitment. An SVP may be held, as the United States Supreme Court stated under similar circumstances, 'as long as he is both mentally ill and dangerous, but no longer.' (*Foucha v. Louisiana* (1992) 504 U.S. 71, 77, 112 S.Ct. 1780.) Given that the denial of access to expert opinion when an indigent individual petitions on his or her own to be released may pose a significant obstacle to ensuring that only those meeting SVP commitment criteria remain committed, we construe section 6608, subdivision (a), read in conjunction with section 6605, subdivision (a), to mandate appointment of an expert for an indigent SVP who petitions the court for release." (*McKee I*, *supra*, 47 Cal.4th at p. 1193.) The court then held that the SVPA, as construed, "does not violate the due process clause." (*Ibid*.)

We are bound by *McKee I* (*Auto Equity Sales*, *Inc. v. Superior Court*, *supra*, 57 Cal.2d at p. 455) and must reject Rose's due process contention.

3. *No Violation of the Ex Post Facto or Double Jeopardy Clause*

A judicial determination that a law is not punitive "removes an essential prerequisite" for both double jeopardy and ex post facto claims. (*Kansas v. Hendricks* (1997) 521 U.S. 346, 369.) In *McKee I*, the Supreme Court concluded: "[T]he nonpunitive objectives of the [SVP] Act—treatment for the individual committed and protection of the public—remain the same after Proposition 83. Moreover, under the Act

after Proposition 83, as before, a person is committed only for as long as he meets the SVP criteria of mental abnormality and dangerousness. As such, the Proposition 83 amendments at issue here cannot be regarded to have changed the essentially nonpunitive purpose of the Act." (*McKee I*, *supra*, 47 Cal.4th at p. 1194.)

After considering "the seven-factor test articulated in *Kennedy v. Mendoza-Martinez* (1963) 372 U.S. 144, 168-169" (*McKee I*, *supra*, 47 Cal.4th at p. 1195), the Supreme Court held that "the Proposition 83 amendments do not make the Act punitive and accordingly do not violate the ex post facto clause." (*Ibid*.) Again, we are bound by *McKee I*. (*Auto Equity Sales*, *Inc*. *v*. *Superior Court*, *supra*, 57 Cal.2d at p. 455.) The Supreme Court's determination that the SVPA is not punitive is also dispositive of Rose's double jeopardy claim. (See *Kansas v*. *Hendricks*, s*upra*, 521 U.S. at p. 369.)

## DISPOSITION

The August 17, 2012 order of commitment is affirmed.

24

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.



_____

PREMO, J.